The Honorable Steve Lloyd State Representative, 64th District State Capitol, Room 181-W Topeka, Kansas 66612
Dear Representative Lloyd:
You request our opinion on four questions involving the provisions of K.S.A. 17-5902 et seq., the agricultural corporations act. The questions concern the ability of a board of county commissioners to rescind a resolution which allows either corporate swine or dairy facilities to be located within the county:
 "1) Does a county have the ability to rescind the resolution if a corporate entity has either already purchased land in the county for the purpose of constructing swine or dairy facilities or has purchased land in the county and has begun or completed construction on said facilities?
 "2) Since the statute did not specifically allow reversal of this authority, would existing facilities be grand-fathered?
 "3) If they are grand-fathered, would they be allowed to expand and what criteria would be imposed on the expansion?
 "4) If a county did not have the authority to rescind its previous action, what recourse is available for those affected by the reversal?"
The agricultural corporations act, or corporate farming act, prohibits specified corporations from directly or indirectly owning, acquiring or otherwise obtaining or leasing agricultural land. Some types of corporations may own or lease such land if the corporation falls within one of the enumerated exceptions set forth in K.S.A. 17-1504. See also
Attorney General Opinion No. 92-148. We will assume, for purposes of this opinion, that the corporations in question fall under the prohibitions set forth in this act. Such corporations may not undertake prohibited activities in Kansas absent approval by a board of county commissioners acting in accordance with the procedures set forth in K.S.A. 17-5902 et seq.
K.S.A. 17-5907 provides the procedure for approving corporate dairy production facilities within a county and K.S.A. 17-5908 is the corollary for corporate swine production facilities. Both statutes allow, but do not require, a county to permit corporate farming operations within the county. The statutes provide for electorate ability to block the proposed approval by protest petition. Absent a timely filed protest petition, the act permits a board of county commissioners to proceed with a resolution allowing corporate farming within the county. As you state your question in terms of a fait accompli county action, we must assume that the procedures required by the statutes were followed by the county.
The act in question does not set forth a procedure for rescinding resolutions approving corporate farming. Private counsel for corporate farming companies argue this absence is evidence of legislative intent to prohibit such rescission. However, this is contrary to common law principles concerning the authority of a legislative body to subsequently change or alter public policy:
 "Where a county board or court exercises functions which are legislative, administrative or ministerial in their nature and which pertain to the ordinary county business, and the exercise of such functions is not restricted as to time and manner, it may modify or repeal its action, provided rights of third persons have not become vested thereunder; but this rule does not apply where the time and mode of the exercise of the particular function is prescribed by statute, or where the statute authorizing the action of the board provides that such action may be changed only by general law. . . ." 20 C.J.S. Counties § 92 (1990).
Thus, as with the laws enacted by the state legislature, county policies or regulations may generally be subsequently altered or changed in accordance with the general authority vested in the legislative body, subject only to any legal limitations applicable to the specific rescission actions in question. Where there is no specific statutory procedure dictated, counties often utilize home rule authority pursuant to K.S.A. 19-101a.
K.S.A. 19-101c establishes that the home rule power granted counties be liberally construed for the purpose of giving counties the largest measure of self government. See City of Junction City v. Lee, 216 Kan. 495
(1975). Home rule power allows a board of county commissioners to transact all county business and perform all powers of local legislation and administration the board deems appropriate, subject to the limitations set forth therein.
K.S.A. 17-1502 et seq. declare specific types of corporate ownership of agricultural land to be prohibited in this state, except in counties granting approval to locate therein. The state legislature delegated decision-making authority on such matters to each county. Whether to allow such corporate operations within a county thereby became county business. Thus, the legislature has declared the issue of corporate farming to be a local matter properly decided by county officials and electors.
In Blevins v. Hiebert, 247 Kan. 1 (1990), the Kansas Supreme Court held that home rule legislation is prohibited in a field of law in which there is a state statute uniformly applicable to all cities or counties. However, the court recognized that home rule power allows concurrent legislation on police power matters as long as the local legislation does not conflict with uniformly applicable and pertinent provisions of state laws.
Counsel for several counties believe that the corporate farming act is not uniform and point out that the 1994 amendments to K.S.A. 17-5904
include different provisions for counties. K.S.A. 17-5904 (a)(15) and (a)(16) make the prohibition against corporate farming inapplicable in counties that have approved such farming, pursuant to the terms of K.S.A. 17-5907 or 17-5908. Thus, the language of this statute treats a corporation different if it operates in a county which has acted to approve such businesses within the county. However, it is the action of the county itself which may make the statutory prohibitions inapplicable. Standing on its own, the corporate farming act uniformly applies to every county in the state and to every farming corporation falling under its scope. Thus, we believe the act is uniform. SeeBlevins, supra at 5.
However, we also believe that the matter concerns the use of police power. "The police power is not susceptible of exact definition . . . the power knows no definite limitations, since in its widest sense it is the power `to govern men and things' and includes all legislation and almost every function of civil government." 6A McQuillin Municipal Corporation
§ 24.03 (1988). However, police power is generally recognized in the more limited sense of governmental power over matters affecting the public health, safety and morals, and to regulate use of, or impair right in, property to prevent detriment to public interest. Dodger's Bar and Grill,Inc. v. Johnson County Board of County Commissioners, 32 F.3d 1436 (10th Circ. 1994); See also Small v. Kemp, 240 Kan. 113 (1986). "[I]t means the power exerted by public authority by restraint or compulsion for the promotion of the public welfare, and to attain this end it restrains the natural or common liberty of the citizen in the use of his personal faculties and his property." McQuillin at § 24.04. In K.S.A. 17-5902 etseq., governmental authority is used to prohibit corporate farming. The legislative history of this act shows the desire of the state to protect the public welfare and interest in regulating large farming facilities.
The final home rule issue to be resolved in answering your first question requires a determination of whether the legislature has preempted the field or a conflict exists between the proposed action and state law. Decisions subsequent to Blevins evidence the court's return to a more liberal interpretation of home rule authority and provide further guidance in determining whether or not local legislation is preempted or conflicts with state law. In McCarthy v. City of Leawood,257 Kan. 566 (1995), the court held that determining whether a legislative enactment is uniformly applicable to all cities requires clear evidence of legislative intent to preclude local legislation before a right to exercise home rule is denied. In reading the statutes in that case, the court stated that "if the legislature had intended the Main Traffic Way Act to be an exclusive means of financing a street so designated, then it could easily have said so." Id. at 578. Thus, as such intent could not be found, the McCarthy court sided with the district court and found that no conflict existed between state law and the local legislation. It therefore permitted the use of home rule to craft alternative procedures and mechanisms from those set forth in the subject act.
In examining whether local action conflicted with state law, the court has stated:
 "In Blevins, we explained that `[n]o one questions, a city's power to legislate by ordinary ordinance in the exercise of its police power so long as such ordinance does not conflict with state law, unless a state statute specifically preempts the field.' 247 Kan. at 6, 795 P.2d 325. The fact that the State has enacted legislation dealing with a particular field does not necessarily deprive a city of the power to concurrently regulate an aspect of the subject area, as long as the city's regulation does not conflict with State law. See Garten Enterprises, Inc. v. City of Kansas City, 219 Kan. 620, Syl. p 6, 549 P.2d 864
(1976). We have consistently rejected the doctrine of implied preemption, reasoning that legislative intent to reserve exclusive jurisdiction must be clear. City of Junction City v. Griffin, 227 Kan. 332, 336, 607 P.2d 459 (1980).
 "In Johnson County Memorial Gardens, Inc. v. City of Overland Park, 239 Kan. 221 (1986), we considered whether zoning ordinances applied to an application for a permit to build a storage shed on cemetery grounds. The construction and maintenance of cemeteries were extensively regulated by statute. We reasoned that the city zoning laws were not preempted by State laws on cemeteries because the State laws did not specifically prohibit local zoning and land use regulations. 239 Kan. at 227, 718 P.2d 1302." Water Dist. No. 1 of Johnson County v. City Council of City of Kansas City, 255 Kan. 183 (1994).
In reviewing these Kansas cases in light of the proposed county home rule rescission of a resolution allowing corporate farming, we find no provision in K.S.A. 17-5902 et seq. that clearly evidences legislative intent to preclude such local legislation. On the contrary, the act makes the issue of whether to allow such operations a matter to be decided by county officials. See K.S.A. 17-5907 and 17-5908.
Counsel for a corporation argues that the failure of the legislature to provide for an "opt-out" procedure is evidence of legislative intent to preclude rescission of prior county approval. However, this argument fails to consider that the activity in question, corporate farming, is not legal in any county until or unless a county affirmatively chooses to "opt-in." The act clearly gives counties the decision-making authority whether to allow corporate farming within their boundaries. If a county resolution is passed to allow corporate farming such corporations are granted a privilege not otherwise available to them under Kansas law. Neither the language of the statutes nor legislative history clearly evidence legislative intent that those counties choosing to grant such a privilege (i.e. those who "opt-in") must forever after allow all corporate farms to operate within their county. We have not located case law, legislative history, or any other authority that evidences a clear intent to require a county to make such a decision permanent. Rather, such a requirement runs counter to historic and common law principles concerning the ability of a municipality to change public policy and repeal a previously enacted ordinance or resolution. McQuillin § 7.34.20.
Therefore, in answer to your first question, it is our opinion that a county may use home rule authority to rescind a resolution previously adopted pursuant to K.S.A. 17-5907 or 17-5908. In taking such action, a county should comply with the procedures set forth in the home rule statutes. See K.S.A. 19-101a (b) and 19-101b (b).
Your remaining three questions concern the possible impact of such rescission upon a corporate entity which has relied upon prior county approval. We have not been provided with all the facts concerning the exact nature and extent of actions taken by a specific corporation. Moreover, the language and terms of a specific home rule resolution may determine the answer to these issues. It is possible that a county which rescinds prior approval of corporate farms may choose to allow existing facilities to expand, continue, or otherwise grandfather in such entities. It is also possible that a rescission resolution may not so provide. Corporations subject to the prohibitions set forth in K.S.A.17-5902 et seq. may argue that the entire act impermissibly takes away their right to make certain use of property they have already acquired or leased. Thus, corporations who have acquired such property after prior county approval under K.S.A. 17-5907 or 17-5908 may challenge the legality of any county rescission action. Analyzing the merits of such a challenge requires a review of police power and takings law.
The fifth amendment to the United States constitution provides that private property shall not be taken for public use without just compensation. This restriction applies to the states through thefourteenth amendment. Chicago B. Q.R. Co. v. Chicago, 166 U.S. 226,241, 41 L.Ed. 979, 986 (1897). The fourteenth amendment to the United States constitution and section 18 of the bill of rights of the Kansas constitution give due process rights designed to protect individuals' property from arbitrary regulations. State ex rel. Stephan v. Smith,242 Kan. 336 (1987). The test for determining whether due process has been afforded is whether the legislation has a real and substantial relationship to the objective sought, whether it is reasonable in relation to the subject, and whether it was adopted in the interest of the community. Joe Self Chevrolet, Inc. v. Board of Sedgwick CountyComm'rs, 257 Kan. 625 (1990). See also Noel v. Menninger Foundation,175 Kan. 751 (1954).
The Kansas Supreme Court has defined taking to mean "the acquiring of possession as well as the right of possession and control of tangible property to the exclusion of the former owner." Lone Star Industries,Inc. v. Secretary, Kansas Dept. of Transp., 234 Kan. 121, 125 (1983). The requirement that there must be an actual taking of property by the government for an individual to receive compensation has been modified. Where the government has imposed significant restrictions on private property, a taking may be found and the government may be required to pay compensation. While a state has the right to regulate or limit the use of property through its police power, if a regulation goes too far it will be recognized as a taking. Pennsylvania Coal Co. v Mahon, 260 U.S. 393, 415,43 S.Ct. 158, 67 L.Ed.2d 322, 326 (1922). Property owners may challenge governmental action impacting private property as an unconstitutional taking or inverse condemnation. "Inverse condemnation is an action or eminent domain proceeding initiated by a property owner rather then the condemnor and is available when private property has been actually taken for public use without formal condemnation proceedings and where it appears there is no intention or willingness of the taker to bring an action." Ventures in Property I v. City of Wichita, 225 Kan. 698 (1979).See also Wittke v. Kusel, 215 Kan. 403 (1974).
There is no bright line test for establishing whether legislative actions constitute a use of police power or an eminent domain taking:
 "Eminent domain takes property because it is useful to the public, while the police power regulates the use of property or impairs rights in property because the free exercise of these rights is detrimental to public interest; and the police power, although it may take property, does not, as a general rule, appropriate it to another use, but destroys the property, while by eminent domain property is taken from the owner and transferred to a public agency to be enjoyed by the latter as its own. Many statements of the distinction agree to the effect that in the exercise of eminent domain private property is taken for public use and the owner is invariably entitled to compensation, while the police power is usually exerted merely to regulate the use and enjoyment of property by the owner, or, if he is deprived of his property outright, it is not taken for public use, but rather destroyed in order to promote the general welfare, and in neither case is the owner entitled to any compensation for any injury which he may sustain, for the law considers that either the injury is damnum absque injuria or the owner is sufficiently compensated by sharing in the general benefits resulting from the exercise of the police power." 29A C.J.S. Eminent Domain § 6 (1965).
Statutory and case law authority allow governmental entities to impose restrictions upon some uses of private property. See e.g. K.S.A. 12-741et seq. and K.S.A. 19-2901 et seq. (city and county zoning authority);City of Merriam v. Board of Zoning Appeals of City of Merriam, 242 Kan. 532
(1988); Water Dist. No. 1 of Johnson County v. City Council of City ofKansas City, 255 Kan. 183 (1994); Johnson County Memorial Gardens, Inc.v. City of Overland Park, 239 Kan. 221, (1986); Lawrence PreservationAlliance, Inc. v. Allen Realty, Inc., 16 Kan. App. 2d 93 (1991);Kimberlin v. City of Topeka, 238 Kan. 299 (1985);. Robert L. Rieke Bldg.Co., Inc. v. City of Overland Park, 232 Kan. 634 (1983). Land use restrictions generally qualify as valid exercises of police power.
A state may exercise police power by totally prohibiting persons from engaging in occupations or businesses that are detrimental to the public welfare. 16B C.J.S. Constitutional Law § 857 (1985). Police power may be used in a way that adversely affects the entire value of privately owned property. See Attorney General Opinion No. 88-73. Constitutional limitations form no impediment to the exercise of police power land use regulations where the regulation is reasonable and bears a fair relationship to the object sought to be attained. See Schaake v. Dolley,85 Kan. 598 (1911); Dey v. Knights Ladies of Security, 113 Kan. 86
(1923); McNaughton v. Johnson, 242 U.S. 344, 37 S.Ct. 178, 61 L.Ed. 352
(1916); Lindsey v. Natural Carbonic Gas Co., 220 U.S. 61, 31 S.Ct. 337,55 L.Ed. 369 (1910); Armour Co. v. State of North Dakota, 240 U.S. 510,36 S.Ct. 440, 60 L.Ed. 771 (1915). In Mugler v. Kansas, 123 U.S. 623,8 S.Ct. 273, 31 L.Ed. 205 (1887), the United States Supreme Court reviewed a Kansas prohibition against the sale of liquor. The owner of a brewery challenged the prohibition as a taking of private property. The court found that the law was within the police power of the state, that there was no vested property right in carrying on a business that was legislatively declared detrimental to the public, and that the property owner was not entitled to compensation or a stay on the law's application.
In one of the most recent cases involving the issue of police power versus a taking, the 10th circuit upheld a Wyoming state hunting regulation restricting the availability of hunting licenses to out of state residents. Clajon Production Corp. v. E. Petera et al, No. 94-8071, WL 686509___ F.3d ___ (10th Cir. Nov. 20, 1995). In this case property owners challenged the state regulation under a number of theories, including the takings clause. Plaintiffs argued that the Wyoming restriction was an inappropriate "leveraging of police power" and sought compensation for the state's regulatory taking because it allegedly deprived them of all economically beneficial use of the property. The 10th circuit upheld the regulation as a valid use of police power and stated:
 "[I]t is well established that a `property owner necessarily expects the uses of his property to be restricted, from time to time, by the various measures newly enacted by the State in legitimate exercise of its police power.' Lucas, 112 S.Ct. At 2899. That is, the Takings Clause allows some property owners to be more burdened by a challenged governmental regulation than others because `[w]hile each of us is burdened somewhat by restrictions, we, in turn, benefit greatly from the restrictions that we place on others.' Keystone, 480 U.S. at 491. See also Dolan, 114 S.Ct. At 2316 (acknowledging that `government hardly could go on if to some extent values incident to property could not be diminished without paying for every such change in the general law.') (quoting Mahon, 260 U.S. at 413)." Id. at 9.
Decisions by the Kansas Supreme Court also recognize that the government may properly control the use of private property as an exercise of police power. Constitutional provisions against taking private property for public use without just compensation impose no barrier to the proper exercise of the police power. Small v. Kemp, 240 Kan. 113, (1986). Police power is an inherent power of the sovereign and is essential to protect members of the community from injury. It rests upon the fundamental principle that all property is owned subject to the limitation that its use may be regulated for the safety, health, morals, and general welfare of the community in which it is located. Ray v. State HighwayCommission, 196 Kan. at 22-23, cert. denied 385 U.S. 820, 87 S.Ct. 43,17 L.Ed.2d 57 (1966). See also Kansas City Power Light Co. v. KansasCorporation Comm'n, 238 Kan. 842, 850 (1986).
In Hudson v. City of Shawnee, 246 Kan. 395 (1990), the court found that government imposed regulations are not unconstitutional merely because they operate as a restraint upon private rights of persons or property or will result in a diminution of the property value of individual properties. The infliction of such loss is not automatically a deprivation of property without due process of law. The exertion of the police power upon objects lying within its scope in a proper and lawful manner is due process of law. Hence, the police power may be exerted to restrain land uses by private persons, and where appropriate or necessary, may even be used to prohibit certain uses of property in aid of the public safety and general welfare.
Nevertheless, some governmental restrictions upon land use have been found to result in inverse condemnation. Although the plaintiffs were not successful in the case, the Kansas Supreme Court has discussed the potential for inverse condemnation recovery in situations involving commercial development of property based upon prior governmental approval:
 "Had plaintiffs developed their property for commercial uses or even taken any substantial steps toward such development we would have an entirely different lawsuit. It might then be akin to the second Kansas case we find persuasive, Spurgeon v. Board of Commissioners, 181 Kan. 1008, 317 P.2d 798. In that case this court upheld a Shawnee county zoning resolution which required the removal within two years of auto wrecking yards located in residential zones, even though they were lawful prior nonconforming uses. The two year period was held reasonable in view of the owner's capital investments, and the resolution was held to be a valid exercise of the police power as against the landowners' claim that they were being deprived of their property without due process of law. It appears to us that if a governing body can constitutionally zone an existing business out of existence, it can surely zone against a use which is merely contemplated at some indefinite time in the future. We conclude that plaintiffs had no constitutional right to the continuation of the zoning existing at the time they purchased their land." Colonial Inv. Co., Inc. v. City of Leawood, 7 Kan. App. 2d 660 (1982).
We do not believe that a county's rescission of approval for certain land uses constitutes inverse condemnation especially in those counties that do not yet have any corporate ownership or active corporate farming operation. We have located no authority that recognizes a vested property interest in a law remaining the same. We recognize that in some counties corporations may have undertaken substantial property acquisition based upon the prior action taken under K.S.A. 17-5902 etseq. Such reliance and substantial investments might persuade a court that some taking occurs in prohibiting the intended use of specific property. See Florida Rock Industries v. U.S., 18 F.3d 1560 (Fed. Cir. 1994); Ventures, supra. However, this area of taking law is not clear and must ultimately be determined by a court reviewing all pertinent facts concerning the economically viable options left after the government action in question. If a county rescinds approval of corporate farming operations within the county, a corporate property owner will not lose possession of their land or any buildings erected thereon. Rather, if a county rescinds prior approval of corporate farming, the status of such operations returns to the general rule set forth in that act. The subject corporation will only lose the opportunity to continue to use the property for a specific line of business. There is no actual loss or taking of real estate or personal property. The corporation may still use the property for all other legal purposes. The corporation remains able to retain control over the property until or unless they choose to sell it. Thus, in keeping with the eminent domain and police power cases cited herein, it appears that the impact of county recision of approval of corporate farming within the county will not deprive a corporation of all economic benefit of their property rights.
However, the most prudent course of action may be to prospectively use county home rule authority and grandfather in existing operations. Nevertheless, while a county may wisely choose to grandfather existing corporate farming operations that have undertaken substantial property acquisition in light of prior county approval, we do not believe that rescission of a corporate farming resolution rises to the level of an inverse condemnation taking action. It is our opinion that such recision takes place as an exercise of police power. If a county chooses to allow such corporations to continue operating within the county, while prohibiting any new businesses of the same type, we do not find any authority which requires the county to allow such corporations to expand operations in the future.
Very truly yours,
 CARLA J. STOVALL Kansas Attorney General
 Theresa Marcel Nuckolls Assistant Attorney General
CJS:JLM:TMN:jm