No. 58,293

Kansas City Power & Light Company, *Appellant*, v. The State Corporation Commission of the State of Kansas, Michael Lennen, Chairman, Margalee Wright and Keith R. Henley, Commissioners, and their respective successors in office as the constituent members of the State Corporation Commission of the State of Kansas, *Appellees*.

(715 P.2d 19)

Opinion filed February 21, 1986.

*Lowell L. Smithson*, of Spencer, Fane, Britt & Browne, of Kansas City, Missouri, argued the cause and *Charles S. Schnider*, of the same firm, of Overland Park, *John W. Simon*, of the same firm, of Kansas City, Missouri, *Warren B. Wood*, of Kansas City Power & Light Company, of Overland Park, and *Richard M. Smith*, of Smith & Winter-Smith, of Mound City, were with him on the brief for appellant.

*Brian J. Moline*, general counsel, State Corporation Commission, argued the cause and *Robert M. Fillmore, Eva Powers*, and *Mary Ann Neath*, all of the State Corporation Commission, were with him on the brief for appellees.

*Warren E. Baker*, of Prairie Village, was on the brief for intervenor-appellee American Paper Institute, Inc.

*Thomas W. Porter*, of Erickson & Hall, of Topeka, was on the brief for *amicus curiae* Martin Tractor Company.

The opinion of the court was delivered by

Lockett, J.: Kansas City Power & Light Company (KCP&L) appeals from a decision of the District Court of Linn County, Kansas, upholding an order of the State Corporation Commission (KCC) which requires an electric utility to enter into a contract to purchase electricity from a cogenerator or small power producer. The KCC order was in implementation of § 202 and § 210 of the

federal Public Utility Regulatory Policies Act of 1978 (PURPA, codified as amended at 16 U.S.C. §§ 824a-3, 824i [1982]), Federal Energy Regulatory Commission (FERC) regulations implementing PURPA (18 C.F.R. §§ 292.101-.602 [1985]), K.S.A. 66-1,184, and K.S.A. 66-1,185.

A statement of the facts involved in this case is set forth in *Kansas City Power & Light Co. v. Kansas Corporation Comm'n,* 234 Kan. 1052, 676 P.2d 764 (1984). The facts surrounding the federal statute are set forth in *FERC v. Mississippi,* 456 U.S. 742, 72 L. Ed. 2d 532, 102 S. Ct. 2126 (1982).

In 1978, the Congress of the United States enacted the Public Utility Regulatory Policies Act of 1978 (Pub. L. No. 95-617). Congress acted in concern for the energy crisis and the rapid increases in the cost of electricity. Section 210 of the act directed the Federal Energy Regulatory Commission to promulgate rules to encourage cogeneration. FERC enacted a rule requiring utilities to purchase electric energy from qualifying cogenerators and small power production facilities (cogenerators) at a rate equal to the utility's "full avoided cost." FERC also required utilities to make such physical interconnection with cogenerators as necessary to effect purchases of sales of electricity authorized by PURPA. In 1979, the Kansas legislature responded to PURPA by enacting K.S.A. 66-1,185, which gave the KCC such jurisdiction as was required to comply with and carry out the requirements of PURPA and the rules and regulations adopted by FERC. To carry out the legislature's mandate, the KCC adopted rules and regulations.

In *Kansas City Power & Light Co. v. Kansas Corporation Comm'n,* 234 Kan. 1052, this court determined that the orders of the KCC which required an electric utility to purchase electricity from a cogenerator at a rate greater than the federally regulated rate (avoided cost to the utility) were unlawful, unless the KCC first obtained a waiver from FERC. That determination made it unnecessary for this court to discuss the constitutional issues raised by KCP&L at that time. On this appeal, KCP&L raises the constitutional issues.

In *FERC v. Mississippi,* 456 U.S. 742, the United States Supreme Court held that Congress, acting under its police powers for the protection of the public health, safety, and welfare and the preservation of national security, exercised congres-

sional authority under the commerce clause of the Constitution to enact PURPA to encourage development of cogenerators. The Supreme Court determined that the Congress had authority to act under the commerce clause of the Constitution, and it did not entrench upon state sovereignty in violation of the Tenth Amendment. The Court did not consider whether the act violated any other sections of or amendments to the Constitution.

In *American Paper Inst. v. American Elec. Power,* 461 U.S. 402, 76 L. Ed. 2d 22, 103 S. Ct. 1921 (1983), the Supreme Court determined that FERC did not act arbitrarily or capriciously in promulgating certain regulations as to the cost of purchasing electricity from cogenerators and that requiring public utilities to make interconnections with cogenerators was necessary to consummate purchases and sales authorized by PURPA. No purchase or sale of power required by PURPA could be completed without an interconnection between the buyer and the seller.

Both American Paper Institute, Inc., an intervenor-appellee, and Martin Tractor Company, Inc., *amicus curiae,* contend that the United States Supreme Court determined that PURPA was constitutional in *FERC v. Mississippi,* and that the regulations implementing the PURPA provisions were lawful in *American Paper Inst. v. American Elec. Power,* 461 U.S. 402, and, therefore, this court does not need to consider their constitutionality. They contend that United States Supreme Court decisions are precedent for issues of constitutional law even though the issue is not briefed or argued before the Court, and even though the Court's opinion contains no discussion of the issue. *Hicks v. Miranda,* 422 U.S. 332, 45 L. Ed. 2d 223, 95 S. Ct. 2281 (1975). They argue that since the Court in *FERC v. Mississippi,* 456 U.S. 742, determined that the act did not violate the Tenth Amendment, that decision necessarily indicates that the act does not violate any provisions of the Constitution. We do not agree. In *Hicks v. Miranda,* 422 U.S. 332, the United States Supreme Court was discussing that court's use of summary decision without a written opinion when affirming the judgment of a lower federal court. Here, the Court in a written opinion made a specific determination that the act did not violate the Tenth Amendment. Whether the act violated the Fifth or Fourteenth Amendments was not determined.

We are asked by KCP&L to declare that a federal statute

violates the constitutions of both the United States and the State of Kansas. If a federal statute does not violate the Constitution of the United States, it cannot be held unconstitutional on the grounds that it violates a state constitution. Under the circumstances, whether PURPA violates our state constitution is beyond the jurisdiction of this state appellate court to determine. *McCulloch v. Maryland*, 17 U.S. 316, 4 L. Ed 579 (1819). The only issue we need to determine is whether PURPA and the regulations promulgated by FERC violate the Fifth Amendment of the Constitution of the United States.

KCP&L raises these constitutional issues:

1. Whether the statutory scheme of PURPA unconstitutionally authorizes the taking of property without compensation and for the use of private persons in violation of the Fifth Amendment of the Constitution.

2. Whether the appellant's right to freedom of contract under the Fifth Amendment is violated by forcing the appellant to purchase electricity from third parties.

3. Whether the statutory scheme of PURPA violates the appellant's due process rights guaranteed by the Fifth Amendment.

KCP&L contends that PURPA contains several violations of the taking clause of the Fifth Amendment of the United States Constitution. The KCC contends that there are no violations of the taking clause.

The Fifth Amendment states:

"nor shall private property be taken for public use, without just compensation."

The Supreme Court has stated that the Fifth Amendment clause providing that private property shall not be taken for public use without just compensation was designed to bar government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole. *Penn Central Transp. Co. v. New York City,* 438 U.S. 104, 57 L. Ed. 2d 631, 98 S. Ct. 2646 (1978).

The question of what constitutes a "taking" of private property has proved to be a problem of considerable difficulty. There have not developed any rigid rules or set formula for determining when justice and fairness require that economic injuries caused by public actions be compensated. Whether there is a compensable "taking" under the Fifth Amendment depends

largely upon the particular circumstances of each case. *Penn Central Transp. Co. v. New York City,* 438 U.S. at 124.

KCP&L contends that its Fifth Amendment right to just compensation for the taking of property has been violated by the statutory and regulatory scheme promulgated under PURPA. It contends that the statutory scheme has resulted in an unconstitutional taking in three primary areas: (1) it must pay cogenerators the avoided energy cost of energy received; (2) it must allow cogenerators to make physical connection with the KCP&L transmission and distribution system at the site of a KCP&L easement; and (3) it requires KCP&L to idle or forego use of its generating capacity.

KCP&L contends that it is forced to pay its money, which is private property, to private parties, the cogenerators, and that this is a taking of private property for private use.

KCP&L cites *Thompson v. Consolidated Gas Co.,* 300 U.S. 55, 81 L. Ed. 510, 57 S. Ct. 364 (1937), as support for its argument. In that case, the validity of a gas proration order issued by the Railroad Commission of Texas for the Panhandle fields was challenged. Under the orders to protect correlative rights of others in the natural gas pool, the production of natural gas was prorated by restricting the production of well owners, who had constructed pipelines that were necessary to fulfill their existing contracts, to an amount below their contract requirements. To fulfill the contracts, they were compelled to purchase gas from other well owners in the pool of gas, who were prohibited by law from producing because they had no market or pipelines. The court determined that the effect of such orders was to take from the owners, who had a market for their gas, a substantial and valuable interest in their private marketing contracts and the use of their pipelines and other facilities for transmitting their gas to market without just compensation. There was no taking for the public benefit nor payment of compensation provided. 300 U.S. at 77-79.

*Thompson* can be distinguished on the facts from the present case. The court made clear in *Thompson* that the pipelines were neither a common carrier of gas nor used in connection with the operation of any public utility. It said that it was beyond the power of the state by legislative fiat to convert property used exclusively in the business of a private carrier into a public utility, or to make the owner a public carrier, for that would be

taking private property for public use without just compensation. *Michigan Commission v. Duke*, 266 U.S. 570, 577-78, 69 L. Ed. 445, 45 S. Ct. 191 (1925).

A utility company has the same rights under the taking clause as other private entities. The federal government may, however, under its police power, regulate a business affected with a public interest and, since the prime characteristic of a public utility is that of public use or service, it is clear that the federal government may regulate and control public utilities to protect the public interest and to promote the health, comfort, safety, and welfare of the people. *Great Northern Ry. v. Washington*, 300 U.S. 154, 81 L. Ed. 573, 57 S. Ct. 397 (1937).

While the regulations do require the utilities to pay private individuals for electricity supplied by the individuals, the public utilities are not of the same character as a private business, and have always been subject to governmental regulation. The purpose behind PURPA supports such an action. As Congress stated:

"The Congress finds that the protection of the public health, safety, and welfare, the preservation of national security, and the proper exercise of congressional authority under the Constitution to regulate interstate commerce require . . . a program providing for increased conservation of electric energy, increased efficiency in the use of facilities and resources by electric utilities, and equitable retail rates for electric consumers." PURPA, 16 U.S.C. § 2601 (1982).

KCP&L claims that the taking clause is violated because no just compensation is received for the money taken, as the power received is neither needed nor wanted. The KCC contends that KCP&L is justly compensated for the electricity it must buy.

On October 15, 1984, the KCC issued an order which established a purchase rate for cogenerated energy. The newly established purchase rate for cogenerated energy was based upon the energy cost, primarily fuel, avoided by KCP&L by reason of not generating the energy itself. KCP&L's cost of cogenerated energy is passed on to its ratepayers on a monthly basis through its energy cost adjustment tariff clause. The newly established purchase rate contains no avoided capacity cost (fixed plant cost) component. The electric service tariffs of KCP&L incorporate a return of and a return on KCP&L capacity costs. KCP&L is reimbursed dollar for dollar by ratepayers for all sums paid by KCP&L to cogenerators. In addition, KCP&L receives a profit because KCP&L rates for resale of cogenerated energy contain a

return of and return on capacity cost which is not shared with cogenerators.

In a number of cases involving the condemnation of real property or an interest therein, the United States Supreme Court has recognized the principle that the function of compensation is to put the owner in as good a position pecuniarily as he would have occupied if his property had not been taken. *Olson v. United States*, 292 U.S. 246, 78 L. Ed. 1236, 54 S. Ct. 704 (1934); *Phelps v. United States*, 274 U.S. 341, 71 L. Ed. 1083, 47 S. Ct. 611 (1927). It has also applied the rule that where the property condemned has a market, the measure of the owner's indemnity is generally the market value of the property. *United States v. Virginia Electric Co.*, 365 U.S. 624, 5 L. Ed. 2d 838, 81 S. Ct. 784 (1961); *United States v. Twin City Power Co.*, 350 U.S. 222, 100 L. Ed. 240, 76 S. Ct. 259 (1956).

In the present case, KCP&L is receiving just compensation. It is allowed to charge its ratepayers its "avoided cost" paid to the cogenerators, plus a profit. This satisfies the Fifth Amendment requirement for just compensation.

KCP&L claims that the taking clause is violated because the statutes cause KCP&L, without any compensation therefor, to provide to the private cogenerator the right of permanent physical connection with and the right of permanent physical access to KCP&L's transmission and distribution network. The KCC contends that there is no taking because the energy transfers to KCP&L from cogenerating customers take place at the meter of the customer and not upon the real property of KCP&L.

KCP&L cites *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S 419, 73 L. Ed. 2d 868, 102 S. Ct. 3164 (1982), in support for its argument. In *Loretto*, the State of New York enacted legislation to facilitate tenant access to cable television. The law required the installation of cable television facilities upon the landlord's property for his tenants (noncrossover) and a crossover right to supply tenants of other buildings with cable television. The landlord could not demand payment from either the tenant for permitting CATV (noncrossover), or the CATV company for its crossover installation on the landlord's property in excess of any amount which the State Commission on Cable Television determined by regulation to be reasonable. Prior to the state law, the landlords were paid five percent of the gross

revenues the CATV company received from the landlord's tenants (noncrossover). The commission determined that a one-time $1 payment was the proper fee for both the crossover and noncrossover installations. A landlord brought suit against a cable television company, alleging that the company's installation was a trespass and, insofar as it relied on the state law, a taking without just compensation.

A divided United States Supreme Court concluded that the physical occupation of the owner's property authorized by the state law constituted a "taking" of property for which just compensation was due. In such circumstances, the owner has an expectation of compensation. The court did not question the State's broad power to impose appropriate restrictions upon the owner's use of his property. The case was remanded in order that the state court could determine the proper compensation the owner should receive for the "taking" of his property.

*Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S 419, was decided June 30, 1982, by a divided court. *American Paper Inst. v. American Elec. Power*, 461 U.S. 402, was decided May 16, 1983, by a unanimous court. Both opinions were written by Justice Marshall. In *Loretto*, the court determined that the State had the power to impose the restrictions upon the landlord's property, but state law did not provide just compensation for the taking. In *American Paper*, the court determined that Congress had properly exercised its authority under the commerce clause when enacting PURPA, since under the act it was necessary to require utilities to make physical connections in order to consummate the purchase of electricity from cogenerators. The court noted that each qualifying cogenerator pays any interconnection costs which the State regulatory authority may assess against the qualifying cogenerator on a nondiscriminatory basis. 18 CFR § 292.306(a)(1982).

The KCC argues that the taking comes under the police power of the federal government and that a taking under the police power can be accomplished without compensation. There is a distinction between the exercise of the police power and a taking by eminent domain. Eminent domain is the taking of property because it is useful to the public, while the police power regulates the use of, or impairs a right in, property to prevent detriment to public interest. In the exercise of eminent domain,

private property is taken for public use and the owner is compensated, while the police power regulates an owner's use and enjoyment of property, or deprives him of it, by destruction, for the public welfare, sometimes without compensation other than the sharing of the resulting general benefits. Constitutional provisions against taking private property for public use without just compensation impose no barrier to the proper exercise of the police power. *Busch v. City of Augusta*, 9 Kan. App. 2d 119, 674 P.2d 1054 (1983).

Congress has provided that the cogenerator pay compensation to KCP&L for the cost of the connection. Since a utility is adequately compensated for the intrusion, it does not matter whether Congress acted under its police power or as an exercise of eminent domain. KCP&L's claim that the taking was without just compensation is without merit.

KCP&L contends that it is forced, without any compensation, to suffer the physical intrusion of power into its system and to surrender to private parties the physical use of its transmission and distribution network. The KCC contends that there is no physical intrusion of the cogenerator's power into the utility's transmission and distribution system, since the transfer of power to KCP&L by the cogenerator occurs at the customer's meter. It contends that, once the power passes through the customer's meter, KCP&L transmits and distributes the power to its customers as needed. We agree.

KCP&L next contends that the statute results in the taking from KCP&L of the right to use its own electrical capacity, without any compensation. KCP&L, when receiving transmissions from cogenerators, must cut back on its own generating capacity and must allow room in its transmission and distribution system for the transmissions from the cogenerators. KCP&L again relies on *Thompson* and *Loretto* for its argument that this is an intrusion which results in a taking without compensation.

This claim is similar to issues previously discussed in this opinion. The transfer of power from the cogenerator to KCP&L occurs at the customer's meter. At that point, it is KCP&L's power that is transmitted through its system. KCP&L's cost of the cogenerated power purchased is passed on to its ratepayers. In return, the utility receives its cost plus a profit guaranteed to the utility under the KCC regulations. This claim is without merit.

KCP&L is not without protection to insure that it is able to render adequate service to its users. 16 U.S.C. § 824k (1982) provides that no order may be issued by the Commission under 16 U.S.C. § 824i (1982) unless the Commission determines that such order:

"(1) is not likely to result in a reasonably ascertainable uncompensated economic loss for any electric utility . . .
(2) will not place an undue burden on an electric utility . . .
(3) will not unreasonably impair the reliability of any electric utility . . . and
(4) will not impair the ability of any electric utility affected by the order to render adequate service to its customers."

Further protection is provided by our legislature. Electric utilities, to insure the safety and quality of their system, have the right to require the cogenerator to limit the production of power to an amount equal to the load at the cogenerator's facility. K.S.A. 66-1,184.

KCP&L contends that the statutory scheme violates its freedom of contract in three ways: (1) it is not allowed to form its own contracts with the cogenerators, because the statute provides the contract; (2) the compulsory formation and performance of the contract violates the taking clause; and (3) the formation and performance of the contract violates due process.

The Supreme Court has held that freedom of contract is a part of the liberty protected by the due process clauses of the Fifth and Fourteenth Amendments. *Board of Regents v. Roth,* 408 U.S. 564, 33 L. Ed. 2d 548, 92 S. Ct. 2701 (1972). Freedom of contract, however, is not absolute, for the freedom of contract guaranteed by the Constitution is freedom from arbitrary restraint, not immunity from reasonable regulation. *West Coast Hotel Co. v. Parrish,* 300 U.S. 379, 81 L. Ed. 703, 57 S. Ct. 578 (1937). Congress may regulate the making and performance of contracts whenever reasonably necessary to effect any of the purposes for which the national government was created. *Highland v. Russell Car Co.,* 279 U.S. 253, 73 L. Ed. 688, 49 S. Ct. 314 (1929). The power of government extends to the denial of liberty of contract to the extent of forbidding or regulating every contract which is reasonably calculated to injuriously affect the public interests. *Atlantic Coast Line v. Riverside Mills,* 219 U.S. 186, 202, 55 L. Ed. 167, 31 S. Ct. 164 (1911).

KCP&L argues that it can be regulated only with respect to its area of operation, that it holds itself out as a seller of electricity,

and that it, therefore, cannot be forced to become involved in buying electricity.

Among cases cited by KCP&L supporting its argument are:

*Transok Pipe Line Co. v. Richardson*, 593 P.2d 1079 (Okla. 1978). There, a pipeline company challenged a state statute which required it to connect, at its own expense, and furnish gas to landowners over whose property it had been granted pipeline right-of-way, at less than the cost of the gas furnished. The court concluded that requiring the producer to make gas available for such a purpose was a taking of private property for a private use and in contravention of the state's constitution.

*Cal. Water & Tel. Co. v. Public Util. Com.*, 51 Cal. 2d 478, 334 P.2d 887 (1959). The case involved review of an order of the Public Utilities Commission purporting to modify the terms of a certain contract between the water utility and the developer of a subdivision. The court determined that within the limits of its jurisdiction, the commission could order a public utility to render certain services on certain terms and conditions, and in so doing it was not bound by the terms of a utility's previously negotiated contracts. But, it said that the law is clear that an order directing a public utility to set aside its property for a use other than the public use to which the utility has been dedicated cannot be justified.

*Ex parte Goodrich*, 160 Cal. 410, 117 Pac. 451 (1911), and *In Re Opinion of the Justices*, 300 Mass. 591, 14 N.E.2d 392 (1938). Both cases deal with statutes requiring electric companies to furnish their consumers with electric light bulbs without charge. In each case, the court held that the selling of electrical appliances was a business separate and distinct from the manufacture, sale and distribution of electrical energy, and that electric companies could not be required to perform a duty outside their original undertaking, unless they were compensated therefor.

The KCC argues that these cases are not applicable to the present situation because it is within the scope of KCP&L's duty to generate or purchase electric energy for sale to its customers. KCP&L is required to sell electricity, and it must have the electricity available to sell. It can have electricity available by either producing the electricity itself or by buying it from an-

other producer. The federal statutes requiring the utilities to buy from cogenerators are reasonable considering the purpose behind PURPA and that the required purchase of electricity by the utility is not beyond the scope of the service provided by that utility.

Freedom of contract is a qualified and not an absolute right. Liberty implies the absence of arbitrary restraint, not immunity from reasonable regulations and prohibitions imposed in the interests of the community. Public utilities are subject to regulation to promote the public good. In the present case, KCP&L's freedom to contract or not to contract with the cogenerators is not breached by the regulations promulgated under PURPA. The purchase of power from cogenerators for sale to the utility's customers is not separate and distinct from the manufacture, distribution and sale of the utility's original undertaking.

KCP&L's last contention is that the statutory scheme deprives it of due process of law. It contends that it violates the due process clause because the means Congress employed to accomplish its goals lacks a real and substantial relation to its ostensible end. The basic purpose of PURPA was to cut back on the use of scarce natural gas and imported oil to produce electricity. KCP&L notes that KCP&L uses coal to produce over 96 percent of its electricity, yet cogenerators have the right to burn oil or natural gas to produce the heat that they use to produce electricity. KCP&L contends that whereas the market would encourage these businesses to conserve on oil and natural gas, PURPA artificially rewards them for burning oil and natural gas by requiring entities to pay them money and give them property rights free. Because the electricity cogenerators produce is forced into their system, KCP&L is forced to back down on its generation, which uses fuels other than oil and gas. Thus, generators burning coal must be operated at lower, less efficient levels in order to make room for electricity produced by burning oil and gas.

The guaranty of due process found in the Fifth Amendment of the Constitution declares that no person shall "be deprived of life, liberty, or property without due process of law." If the goals sought by federal legislation are legitimate, and the classification adopted is rationally related to the achievement of those goals, then the action of Congress is not so arbitrary as to violate the

due process clause of the Fifth Amendment. *Richardson v. Belcher,* 404 U.S. 78, 30 L. Ed. 2d 231, 92 S. Ct. 254 (1971).

The test for due process is whether the legislative means selected has a real and substantial relation to the objective sought. The regulation must be reasonable in relation to its subject and adopted in the interest of the community. *Manhattan Buildings, Inc. v. Hurley,* 231 Kan. 20, 30, 643 P.2d 87 (1982).

Where the requirements of due process are concerned, and in the absence of other constitutional restrictions, the federal government is free to adopt whatever economic policy may reasonably be deemed to promote public welfare and to enforce that policy by legislation adapted to its purpose. The courts are without authority either to declare what policy should be, or, when it is declared by the legislature, to override it. If the laws passed are seen to have a reasonable relation to a proper legislative purpose and are neither arbitrary nor discriminatory, the requirements of due process are satisfied. There is no task left for judicial determination. Whether the free operation of the normal laws of competition is a wise and wholesome rule for trade and commerce is an economic question which this court need not consider or determine. *Northern Securities Co. v. United States,* 193 U.S. 197, 337-38, 48 L. Ed. 679, 24 S. Ct. 436 (1904). The legislature is the judge of the necessity of such an enactment, every possible presumption is in favor of its validity, and though the court may hold views inconsistent with the wisdom of the law, it may not annul such law unless it is palpably in excess of legislative power. *Nebbia v. New York,* 291 U.S. 502, 78 L. Ed. 940, 54 S. Ct. 505 (1934).

The federal government may control the conduct of individuals by any regulation which upon reasonable grounds can be regarded as adapted to promote the common welfare, convenience or prosperity. In the present case, the production of electrical power is a relevant concern for Congress. The United States Supreme Court ruled that PURPA was "reasonably adapted to the end permitted by the Constitution." *FERC v. Mississippi,* 456 U.S. 742, 758, 72 L. Ed. 2d 532, 102 S. Ct. 2126 (1982). As the Supreme Court has ruled that there was "ample support for Congress' conclusions," 456 U.S. at 756, it would be difficult for this court to find that there was not. PURPA was designed to encourage increased conservation of electric energy,

increased efficiency in the use of facilities and resources by electric utilities, and equitable retail rates for electric consumers. The law has a reasonable relation to a proper legislative purpose and is neither arbitrary nor discriminatory. Therefore, the requirements of due process are satisfied.

The decision of the district court is affirmed.