274 P.3d 625 (2012)
294 Kan. 220
KANSAS ONE-CALL SYSTEM, INC., Appellant,
v.
STATE of Kansas, Appellee.
No. 104,498.
Supreme Court of Kansas.
April 12, 2012.
*629 Mark G. Ayesh, of Ayesh Law Offices, of Wichita, argued the cause, and Ray E. Simmons, of the same firm, was with him on the briefs for appellant.
Christopher M. Grunewald, assistant attorney general, argued the cause and was on the brief for appellee.
Vaden F. Bales, of Riggs, Abney, Neal, Turpen, Orbison & Lewis, P.C., of Tulsa, Oklahoma, was on the brief for amicus curiae One Call Concepts, Inc.
The opinion of the court was delivered by GREEN, J.:
Kansas One-Call System, Inc. (One-Call) appeals from the summary judgment of the trial court in favor of the State of Kansas in One-Call's suit challenging the constitutionality of the 2008 amendments in House Bill 2637 to the Kansas Underground Utility Damage Prevention Act (KUUDPA), K.S.A. 66-1801 et seq. On appeal, One-Call raises four claims contending that the 2008 amendments to KUUDPA violate: (1) the one-subject rule contained in the Kansas Constitution; (2) the separation of powers doctrine; (3) the Fourteenth Amendment to the United States Constitution right to equal protection; and (4) the Fifth and Fourteenth Amendments to the United States Constitution, which prohibit the taking of private property for public use without just compensation. Because the challenged amendments are valid, we affirm.

FACTS
One-Call began as a voluntary association of utility companies in 1983. Now, it is a nonprofit corporation that comprises the majority of utility companies in the State of Kansas. Since its creation, One-Call has provided information to its members about future planned excavation activities, and it gives its member utility companies an opportunity to mark the location of their underground facilities before excavation work starts. One-Call makes money by charging a referral fee for alerting its members of a planned dig. In some years, One-Call nets revenue; in others, it incurs a loss. In 1993, the Kansas Legislature adopted One-Call's business model and enacted the KUUDPA. K.S.A. 66-1801 et seq.; L. 1993, ch. 217; H.B. 2041 (1993).
The KUUDPA created a mandatory program designed to protect the State's underground *630 utility infrastructure from excavation damage and to protect the public from harm. K.S.A. 66-1801 et seq. The KUUDPA requires diggers to inform a centralized "notification center" of their intent to dig before they start excavating. See K.S.A. 66-1803 ("An excavator shall not engage in excavation near the location of any underground facility without first having ascertained, in the manner prescribed in this act, a location of all underground facilities in the proposed area of the excavation."). The notification center then passes along the dig information to the applicable utility operators. See K.S.A. 66-1805. Upon receiving notification of the proposed dig, utility operators are required to mark the locations of underground utilities to avoid accidental utility strikes. K.S.A. 66-1806(a). The parties agree that "the notification center is the linchpin to the program, ensuring that excavator's project information reaches utility operators, who then identify the location of any potentially affected underground utilities."
In 1993, One-Call began managing and operating the notification center for the State. Utility membership became mandatory. The relationship between One-Call and the notification center is in dispute. One-Call maintains that it is the notification center while the attorney general argues on behalf of the State that it is simply the entity that runs the notification center.
In 2008, the Kansas Legislature amended the KUUDPA. These amendments are the cause for One-Call's lawsuit because both One-Call and its utility members will be affected financially by the amendments. The 2008 amendments include the following changes to the KUUDPA:
 mandated that potable water and sanitary sewage operators become members of the notification system. K.S.A. 2011 Supp. 66-1802(e); K.S.A. 2011 Supp. 66-1805(a).
 trifurcated the utility members into different tiers creatively identified Tier 1, Tier 2, and Tier 3. K.S.A. 2011 Supp. 66-1802(p), (q), (r).
 regulated the membership fees that can be collected from Tier 2 and Tier 3 members. K.S.A. 2011 Supp. 66-1802(r); K.S.A. 2011 Supp. 66-1805(j);
 imposed several public accountability requirements on the State's notification center, including deeming the notification center to be a public agency making its business records subject to the Kansas Open Records Act and the Kansas Open Meetings Act. K.S.A. 2011 Supp. 66-1805(l), (n).
Tier 1 members are the non-water utilities. K.S.A. 2011 Supp. 66-1802(p). There are no restrictions on how the notification center may charge a Tier 1 member for each referral. Tier 2 facilities are the water utilities. K.S.A. 2011 Supp. 66-1802(p). The notification center may only charge Tier 2 utilities 50% of what Tier 1 facilities are chargedK.S.A. 2011 Supp. 66-1805(i)but some larger water utilities may become Tier 3 facilities. To be a Tier 3 member, a larger (more than 20,000 customers) water utility must create its own in-house notification center and employ at least two people to flag the location of its underground utilities. K.S.A. 2011 Supp. 66-1802(r). The notification center may not charge a Tier 3 facility a referral fee; instead the Tier 3 member pays a flat fee of $500 dollars per year. K.S.A. 2011 Supp. 66-1802(r). Although not entirely clear, it would seem that the notification center is not required to inform a Tier 3 member of a proposed dig. Instead, the notification center must provide the excavator with the Tier 3 member's contact information. K.A.R. 82-14-4(c).
One-Call sued to enjoin enforcement of the amendments of House Bill 2637 on the grounds that the amendments violate the original purpose provision from Article 2, § 16 of the Kansas Constitution and the "one-subject" rule. In addition, One-Call contends that the amendments violate the separation of powers doctrine by usurping the power of the Kansas Corporation Commission (KCC); the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution by imposing new requirements on the notification center; and the Takings Clause of the Fifth Amendment to the United States Constitution by setting limits on the fees that may be charged to *631 water and wastewater utility operators. The trial court granted summary judgment in favor of the State. One-Call appealed, and we transferred this case on our own motion under K.S.A. 20-3018(c).

ANALYSIS

Standard of Review
Here we are asked to review the trial court's grant of summary judgment and review the constitutionality of the 2008 amendments to KUUDPA. Our standards of review are familiar.
When the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law, summary judgment is appropriate. The trial court is required to resolve all facts and inferences which may reasonably be drawn from the evidence in favor of the party against whom the ruling is sought. When opposing a motion for summary judgment, an adverse party must come forward with evidence to establish a dispute as to a material fact. In order to preclude summary judgment, the facts subject to the dispute must be material to the conclusive issues in the case. On appeal, the same rules apply; summary judgment must be denied if reasonable minds could differ as to conclusions drawn from the evidence. Osterhaus v. Toth, 291 Kan. 759, 768, 249 P.3d 888 (2011).
"Determining a statute's constitutionality is a question of law subject to unlimited review. But under the separation of powers doctrine, this court presumes statutes are constitutional and resolves all doubts in favor of a statute's validity. Courts must interpret a statute in a way that makes it constitutional if there is any reasonable construction that would maintain the legislature's apparent intent." Brennan v. Kansas Insurance Guaranty Ass'n, 293 Kan. 446, 450, 264 P.3d 102 (2011) (citing State v. Laturner, 289 Kan. 727, 735, 218 P.3d 23 [2009]).
An agency's or board's statutory interpretation is not afforded any significant deference on judicial review. Ft. Hays St. Univ. v. University Ch., Am. Ass'n of Univ. Profs., 290 Kan. 446, 457, 228 P.3d 403 (2010).

Do the Amendments to KUUDPA Violate the Kansas Constitution's One-subject Rule?
One-Call contends that the trial court erred in failing to enjoin the enforcement of the 2008 amendments to KUUDPA on the grounds that the amendments violated Article 2, § 16 of the Kansas Constitution, also known as the one-subject rule. The one-subject rule was adopted by convention and ratified by voters in 1859. It was later enacted in 1861 and has been amended only once since then, in 1974. L. 1861, p. 53; L. 1974, ch. 458, sec. 1. It states:
"No bill shall contain more than one subject, except appropriation bills and bills for revision or codification of statutes. The subject of each bill shall be expressed in its title. No law shall be revived or amended, unless the new act contain the entire act revived or the section or sections amended, and the section or sections so amended shall be repealed. The provisions of this section shall be liberally construed to effectuate the acts of the legislature."
The 1974 amendment made important changes in the one-subject rule. First, the amendment added an exception for appropriation bills. Second, it added the liberal interpretation clause. This clause states: "The provisions of the section shall be liberally construed to effectuate the acts of the legislature." Under this statutory rule of construction, courts construe the statute to effect the beneficial purpose of the statute.
The purpose of the one-subject rule is to prevent legislative abuses such as "logrolling." "Logrolling" refers to a situation in which several legislators combine their unrelated proposals and present them as separate provisions of one bill. The bill then is able to pass by virtue of the combined votes of the separate factions. The perceived evil of this practice is that a measure can pass which, standing alone, would have been defeated. Garten Enterprises, Inc. v. City of Kansas City, 219 Kan. 620, 622, 549 P.2d 864 (1976).
*632 The title of the House Bill 2637 is as follows:
"AN ACT concerning utilities; relating to telecommunications; relating to pricing flexibility and the lifeline service program; concerning the citizens' utility ratepayer board contracting for professional services; relating to the underground utility damage prevention act; concerning local exchange carriers and carriers of last resort; amending K.S.A. 66-1802, 66-1804, 66-1805, 66-1806, 66-2006 and 66-2009 and K.S.A. 2007 Supp. 66-2005 and repealing the existing sections." L. 2008, ch. 122; H.B. 2637.
In 2008, the Kansas Legislature amended the KUUDPA to require the notification center to comply with the Kansas Open Records Act (KORA) and the Kansas Open Meetings Act (KOMA). The amendment states:
"The notification center established pursuant to this section shall be and is hereby deemed to be a public agency and shall be subject to the provisions of the open records act, K.S.A. 45-215 et seq., and amendments thereto, and the open meetings act, K.S.A. 75-4317 et seq., and amendments thereto. . . ." K.S.A. 2011 Supp. 66-1805(l).
One-Call asserts that House Bill 2637 contains two subjects: (1) the requirement that One-Call comply with KORA and KOMA, and (2) the utilities themselves. It claims that the two subjects are too dissimilar to have any relationship or connection between them. The State argues that each component of House Bill 2637 is related to public utilities and contends that One-Call's challenge is without merit.
We have determined that a statute does not violate the single-subject rule unless "invalidity is manifest." KPERS v. Reimer & Koger Assocs., Inc., 262 Kan. 635, 676, 941 P.2d 1321 (1997). Legislation is valid under Article 2, § 16 of the Kansas Constitution, so long as the provisions of the bill are "all germane to the subject expressed in the title," and will be invalidated only where "an act embraces two or more dissimilar and discordant subjects that cannot reasonably be considered as having any legitimate connection with or relationship to each other. [Citation omitted.]" KPERS, 262 Kan. at 676, 941 P.2d 1321. A bill's subject can be as comprehensive as the legislature chooses, as long as it constitutes a single subject and not several different ones. State v. Reves, 233 Kan. 972, 978, 666 P.2d 1190 (1983).
The question then is whether the provisions of House Bill 2637 are germane to, or connected to, House Bill 2637's subject title of utilities and reference to the KUUDPA. The trial court determined that the subjects within the legislation were germane to the broad subject of public utilities. In response to One-Call's argument that House Bill 2637's title should mention something about the notification center becoming a public agency subject to new requirements (KOMA and KORA), the trial court determined that neither KOMA nor KORA include a list of public agencies subject to their provisions. And the trial court further determined that the KOMA and KORA requirements need not be mentioned in the title. As for One-Call's contention that the title should include reference to the Corporation Code under K.S.A. Chapter 17, Articles 63, 65, and 75, the trial court determined that One-Call's contention was devoid of authority that the legislature intended to make the statutory provisions of the Corporation Code, KOMA, or KORA controlling. Moreover, the trial court determined that the Corporation Code does not prohibit more specific statutory regulation for certain corporate entities.
As stated earlier, a title of a bill can be broad and comprehensive and can even include minor subjects. Yet, those minor subjects must be capable of being combined to form "one grand and comprehensive subject." KPERS, 262 Kan. at 677, 941 P.2d 1321. The broad topic of utilities is listed in the title of House Bill 2637 and serves as the larger umbrella category under which the KUUDPA falls. And House Bill 2637's multiple and diverse subjects are related and germane to one another under the all-encompassing category of utilities.
For example, KOMA and KORA relate to and have a connection with the broad term "utilities" because the notification center is under the purview of the KUUDPA, which is *633 contained in House Bill 2637. In addition, the KUUDPA clearly relates to and has a logical connection with utilities through its work to protect the State's underground utility infrastructure from excavation damage and to protect the public from harm.
Moreover, to violate the single subject rule, a bill must have two dissimilar subjects that have no legitimate connection with each other. Reves, 233 Kan. at 978, 666 P.2d 1190. Here, there is a legitimate connection because KORA and KOMA are related to KUUDPA, which is related to utilities in general, and we have held that Article 2, § 16 should be "liberally construed." Moreover, we have declared that a statute is legitimate under that provision unless "invalidity is manifest." KPERS, 262 Kan. at 676, 941 P.2d 1321. While the Kansas Legislature cannot disobey constitutional limitations in the enactment of laws, there is a strong presumption in favor of the validity of any bill passed by the legislature. State, ex rel., v. Shanahan, 178 Kan. 400, 403-04, 286 P.2d 742 (1955).
We reject One-Call's contention that House Bill 2637 contained two subjects. As a result, we determine that the 2008 amendments to KUUDPA did not violate the one-subject rule.

Separation of Powers Doctrine
Next, One-Call contends that the 2008 legislative amendments to KUUDPA violate the separation of powers doctrine because that legislation was adopted after the Kansas Legislature had delegated legislative authority to the KCC under the 2006 amendment to the KUUDPA. In other words, One-Call maintains in its brief that the KUUDPA cannot be amended by the legislature without a revocation or amendment of "the powers previously delegated to the KCC by the legislature as set forth in K.S.A. 66-1813 and 66-1815." But before we consider if there was a separation of powers violation, we first must determine what type of power was delegated to the KCC under the 2006 amendment.
One-Call's argument about what type of power was delegated to the KCC is startlingly inconsistent. In its reply brief to the trial court, One-Call stated that the original version of KUUDPA in 1993 granted an administrative and a police function. One-Call then stated that when KUUDPA was amended to create K.S.A. 2011 Supp. 66-1815, the delegation of power became "as broad a delegation of power possible" without defining what type of power that was.
In its brief, One-Call first makes reference to the legislative branch by stating that the legislature delegated legislative power to the KCC. One-Call then makes reference to the executive branch by citing State ex rel. Tomasic v. Unified Gov. of Wyandotte Co./Kansas City, 264 Kan. 293, Syl. ¶ 10, 955 P.2d 1136 (1998), where we stated that once the legislature delegates a function to the executive branch, it may only revoke that authority by enacting another law. One-Call does not otherwise reference executive power in its brief other than this quote from caselaw in arguing that the legislature needed to first revoke or amend the previously delegated power to the KCC before enacting the 2008 amendments. Later, in its brief, One-Call states that the provisions come under "administrative, rule making or regulatory exercises," indicating administrative power was delegated to the KCC.
On the other hand, the State maintains that the power delegated to the KCC was administrative only. And the State further contends that the KCC's power still depends entirely on the legislature.
The trial court rejected One-Call's argument. Although the trial court determined the delegated power to be legislative, the trial court held that the legislature did not intend to divest itself of legislative authority over the KCC.
Administrative power is the power to administer or enforce laws, while legislative power is the power to make laws rather than the power to enforce them. State ex rel. Tomasic, 264 Kan. at 303, 955 P.2d 1136. A legislature's delegation of legislative power to make a law is improper, unless the Kansas Constitution permits delegation of legislative power to a different branch of government. If the constitution does not permit that type of delegation, the separation of powers doctrine *634 is violated because legislative power is vested in the legislature only. But the legislature can delegate the power to fill in the details of an enacted statute. And standards to govern the exercise of such authority may be implied from the statutory purpose. State ex rel. Tomasic, 264 Kan. at 303-04, Syl. ¶ 6, 955 P.2d 1136.
To distinguish whether the legislature has delegated legislative power or administrative power, the specific standards set out in the delegation must be considered. If the standards are specific, meaning they contain sufficient policies and standards to guide the nonlegislative body, the legislature has delegated administrative power. The legislature can delegate to administrative bodies discretion to "`"fill in the details,"'" provided there are definite standards to guide the exercise of authority. 264 Kan. at 304, 955 P.2d 1136.
The power delegated to the KCC was administrative because the power to adopt rules and regulations is administrative in nature. See State, ex rel., v. Columbia Pictures Corporation, 197 Kan. 448, Syl. ¶ 4, 417 P.2d 255 (1966). The language in K.S.A. 2011 Supp. 66-1815 is identical to that definition of administrative law: it gives the state corporation commission "full power and authority to adopt all necessary rules and regulations for carrying out the provisions." (Emphasis added.)
We have previously identified the KCC as an administrative body, requiring the legislature to provide a clear standard of governing the exercise of delegated authority. See Citizens' Utility Ratepayer Bd. v. Kansas Corporation Comm'n, 264 Kan. 363, 395, 956 P.2d 685 (1998); Kansas Gas & Electric Co. v. Kansas Corporation Comm'n, 239 Kan. 483, 491, 495, 720 P.2d 1063 (1986). The power delegated meets this requirement.
The delegation here was specific because K.S.A. 2011 Supp. 66-1815 limited the KCC's power to adopting necessary rules for carrying out provisions K.S.A. 2011 Supp. 66-1801 through K.S.A. 66-1814. The KCC was not given free rein to create new rules unrelated to those specified provisions. One-Call has cited no authority in support of its position that the legislature ever delegated legislative power to the KCC. And our research has revealed no case in which our appellate courts have ever held that the legislature has delegated legislative power to the KCC.
We further note that K.S.A. 2011-Supp. 66-1815 is not much more expansive than the earlier unchallenged provision, K.S.A. 66-1813, which states that KUUDPA "shall be administered and enforced by the state corporation commission." The only added power the KCC received from the legislature in 2006 was the power to adopt rules and regulations to carry out KUUDPA, which it was already required to do when KUUDPA was created in 1993.
The separation of powers doctrine was not violated by a delegation of administrative power to the KCC. Because there was no usurpation of powers, the trial court properly granted summary judgment to the State on this claim.

What is the Relationship Between One-Call and the Legislatively Created "Notification Center"?
Before we can address One-Call's last two issues, we must determine the relationship between the notification center and One-Call. One-Call's brief routinely refers to the 2008 amendments as legislative interference with a private business. According to One-Call's brief, One-Call is the notification center. Yet, the State refers to the amendments as legislation that regulates a creature of statutethe notification centerand not a private businessOne-Call. The trial court went to some lengths to draw a distinction between the notification center and One-Call.
The original bill in 1993 defined notification center as "a center operated by an organization which has a minimum of five underground operators participating. . . ." H.B. 2041 (1993) (Before House Committee Revision). Now, a notification center is defined as a "statewide communication system operated by an organization." K.S.A. 2011 Supp. 66-1802(i). Similar to K.S.A. 2011 Supp. 66-1805(a), the definition was changed to reflect the intent that there be only one notification center. See L. 1993, ch. 217, sec. 2(g).
*635 K.S.A. 2011 Supp. 66-1805(a) currently states: "This act recognizes the establishment of a single notification center for the state of Kansas." The legislature apparently believed that K.S.A. 2011 Supp. 66-1805(a) created a notification center. For example, K.S.A. 2011 Supp. 66-1805(l) reads: "The notification center established pursuant to this section. . . ." (Emphasis added.) If the notification center is established by statuteK.S.A. 2011 Supp. 66-1805(a)it is not One-Call. And K.S.A. 2011 Supp. 66-1805(o) creates the process under which operation of the notification center is determined. For example, every 5 years the notification center must determine who will operate it. Even the definition of the notification center supports the argument that it is an entity separate from One-Call. See K.S.A. 2011 Supp. 66-1802(i) (a "communication system operated by an organization"). Finally, while not indicative of legislative intent, the KCC regulations define the notification center as the "underground utility notification center operated by Kansas one call, inc." K.A.R. 82-14-1(k) (2011 Supp.).
Under the general rules of statutory interpretation, "[v]arious provisions of an act in pari materia must be construed together in an effort to reconcile the provisions so as to make them consistent, harmonious and sensible." (Emphasis added.) Southwestern Bell Tel. Co. v. Beachner Constr. Co., 289 Kan. 1262, Syl. ¶ 4, 221 P.3d 588 (2009). "Additionally, legislative intent is to be determined from a general consideration of the entire act. An appellate court's duty, as far as practicable, is to harmonize different statutory provisions to make them sensible." Dillon Real Estate Co. v. City of Topeka, 284 Kan. 662, Syl. ¶ 9, 163 P.3d 298 (2007).
Despite the lack of crystal clear language, the statutory scheme does not support the heart of One-Call's argument that One-Call is the notification center. Instead, it is readily apparent that the notification center is a governmental contractor that is currently operated by One-Call. Otherwise, under K.S.A. 2011 Supp. 66-1805(o), it would require One-Call to solicit proposals to run One-Call. Dillon Real Estate Co., 284 Kan. 662, Syl. ¶ 8, 163 P.3d 298 ("The legislature is presumed to not enact useless or meaningless legislation, and an appellate court's interpretation of a statute should avoid absurd or unreasonable results."). A more logical reading of the entire KUUDPA would require the notification center to solicit proposals from companies like One-Call to determine its operator. The trial court correctly concluded that One-Call is an entity distinct from the notification center.

Equal Protection Claim
One-Call next argues that the trial court erred in rejecting its equal protection claim because some of the 2008 amendments to KUUDPA caused it to be treated differently from other private and nonprofit corporations without any rational basis.
The Fourteenth Amendment to the United States Constitution guarantees equal protection under the law "to any person," and the Kansas Constitution Bill of Rights § 1 uses similar language. Here we are asked to determine whether some of the 2008 amendments to KUUDPA impermissibility violate One-Call's right to equal protection under the law.
In Board of Miami County Comm'rs v. Kanza Rail-Trails Conservancy, Inc., 292 Kan. 285, 255 P.3d 1186 (2011), we reiterated the steps in analyzing an equal protection claim:
"The first step of an equal protection analysis is to determine the nature of the legislative classifications and whether the classifications result in arguably indistinguishable classes of individuals being treated differently. . . .
"After determining the nature of the legislative classifications, a court examines the rights which are affected by the classifications. The nature of the rights dictates the level of scrutiny to be applied. . . .
"The final step of the analysis requires determining whether the relationship between the classifications and the object desired to be obtained withstands the applicable level of scrutiny." 292 Kan. at 315-16, 255 P.3d 1186.

*636 Do the 2008 Amendments to the KUUDPA Treat Indistinguishable Classes of Organizations Differently?

One-Call claims that it is being treated differently than every other private not-for-profit corporation in Kansas. Most of One-Call's argument focuses on the application of KOMA and KORA to it. In support of its argument, One-Call relies on our caselaw in Memorial Hospital Ass'n, Inc. v. Knutson, 239 Kan. 663, 722 P.2d 1093 (1986), In re Arbitration between Johns Constr. Co. & U.S.D. No. 210, 233 Kan. 527, 664 P.2d 821 (1983), and the Court of Appeals opinion in Southwestern Bell Tel. Co. v. Kansas Corporation Commission, 6 Kan.App.2d 444, 629 P.2d 1174, rev. denied 230 Kan.819 (1981), for support. One-Call also relies on several attorney general opinions.
The State responds with two arguments. First, it contends that One-Call fails the first step of equal protection analysis because it is not similarly situated to any other company. The State is correct. Second, it argues that KOMA and KORA apply to the notification center under our prior caselaw.
In 2008, the Kansas Legislature amended K.S.A. 66-1805(l) and deemed the notification center to be a public agency subject to KOMA and KORA. The statute states:
"(l) The notification center established pursuant to this section shall be and is hereby deemed to be a public agency and shall be subject to the provisions of the open records act, K.S.A. 45-215 et seq., and amendments thereto, and the open meetings act, K.S.A. 75-4317 et seq., and amendments thereto, except that the notification center or board of directors, or successor managing organization shall not disseminate, make available or otherwise distribute data or information provided by an operator of a tier 1, 2 or 3 facility unless such dissemination, making available or distributing is necessary for the state corporation commission or the notification center to carry out legal duties or specific statutory duties prescribed under this chapter." K.S.A. 2011 Supp. 66-1805(l).
One-Call contends that the Kansas Legislature performed a "frontal lobotomy" on the traditional rules governing the application of KOMA and KORA. See State ex rel. Murray v. Palmgren, 231 Kan. 524, 535, 646 P.2d 1091 (1982) (discussing the five-part test for determining if an organization is a public agency subject to KOMA). But the legislature is not required to follow our prior five-part test in determining whether to designate the notification center a public agency.
One-Call asks us to ignore K.S.A. 2011 Supp. 66-1805(l) and use its caselaw to determine if the notification center is a public agency under KOMA and KORA statutes. One-Call's argument might have merit if it were not for K.S.A. 2011 Supp. 66-1805(l), which specifically designates the notification center as a public agency subject to KOMA and KORA. The caselaw and attorney general opinions cited by One-Call are simply irrelevant. Likewise, the State's response that the notification center is a public agency under previous caselaw is immaterial.
Political or taxing subdivisions of the state are subject to KORA and KOMA. See K.S.A. 75-4318(a) (KOMA); K.S.A. 45-217(f) (KORA). K.S.A. 2011 Supp. 66-1805(l) states that the notification center is a public agency subject to KORA and KOMA. Every case cited by the parties involved a question of whether an organization is subject to KORA and KOMA absent a statutory provision that states the entity is subject to KORA and KOMA. Here, the question is not whether the notification center is a public agency under K.S.A. 75-4318(a) or K.S.A. 45-217(f). To the contrary, the legislature has already answered that question in the affirmative by enacting K.S.A. 2011 Supp. 66-1805(l).
One-Call does not cite a single Kansas authority in making its argument. As the State points out, by law One-Call cannot be similarly situated to any other Kansas company because it operates the "single notification center for the state of Kansas." K.S.A. 2011 Supp. 66-1805(a). Consequently, One-Call fails the first step of equal protection analysis. See Rail-Trails, 292 Kan. at 315, 255 P.3d 1186 ("indistinguishable classes of individuals being treated differently").
*637 Nevertheless, according to One-Call, the notification center's public accountability statutes are unconstitutional. "The Constitution does not require things which are different in fact or opinion to be treated in law as though they were the same." Tigner v. Texas, 310 U.S. 141, 147, 60 S.Ct. 879, 84 L.Ed. 1124 (1940). The Equal Protection Clause allows states to write into law differences that exist in those areas which public power is exerted. Tigner, 310 U.S. at 147, 60 S.Ct. 879 ("And so we conclude that to write into law differences between agriculture and other economic pursuits was within the power of the Texas legislature.").
For example, in explaining that the Kansas Legislature has the constitutional authority to impose a burden on a party that may not be contractually waived or assumed by another party, we stated:
"The Kansas Legislature has the constitutional authority to impose a burden on a party that may not be contractually waived or assumed by another party. [State v. Mwaura,] 4 Kan.App.2d [738,] 470-41 [740-41, 610 P.2d 662, rev. denied 228 Kan. 807 (1980)]. For example, the legislature may constitutionally impose on the seller of a used car a nondelegable duty to see that the car meets minimum safety standards. 4 Kan.App.2d at 741 [610 P.2d 662]. The legislature similarly has the constitutional authority to protect the lives and property around underground utilities." Double M Constr. v. Kansas Corporation Comm'n, 288 Kan. 268, 277, 202 P.3d 7 (2009).
The notification center furnishes an important public service. Double M Constr., 288 Kan. at 272, 202 P.3d 7 (The KUUDPA "creates a statutory duty to the public to ensure the safety and integrity of underground utilities."). And "[t]he legislature similarly has the constitutional authority to protect the lives and property around underground utilities." 288 Kan. at 277, 202 P.3d 7. As a result, the Kansas Legislature has the authority to write into law differences that exist in those areas in which public power is exerted. Thus, One-Call's equal protection claim fails.

Fifth Amendment Violation
Finally, One-Call, in its taking claim, contends that the trial court improperly rejected its assertion that the fee provisions of the amendments "fix rates which are so low as to be confiscatory."
Under the 2008 amendments, One-Call may charge Tier 2 facilities (water utilities) only 50% of what it charges Tier 1 facilities (other utilities). K.S.A. 2011 Supp. 66-1805(j). Additionally, a Tier 3 facility (large water utilities with their own separate "one-call system") owes the notification center only $500 annually. K.S.A. 2011 Supp. 66-1802(r). One-Call contends that the fee structure is a taking without just compensation.
First, One-Call contends that the legislature lacked any authority "to implement the rates to be charged by [One-Call]" because it delegated that authority to the KCC. That line of reasoning is totally unrelated to a taking analysis, and it apparently makes reference to One-Call's second issue. Second, One-Call relies on a 1921 federal district court opinion from Louisiana and argues that the setting of the rates for Tier 2 and Tier 3 facilities is "clearly a taking of property." See O'Keefe v. City of New Orleans, 273 F. 560 (D.C.La.1921). On the other hand, the State argues that One-Call has not suffered a taking because it may charge Tier 1 members whatever it desires.
The Takings Clause of the Fifth Amendment to the United States Constitution, applicable to the states through the Fourteenth Amendment, provides that private property shall not be "`taken for public use, without just compensation.'" Lingle v. Chevron U.S.A., Inc. 544 U.S. 528, 536, 125 S.Ct. 2074, 161 L.Ed.2d 876 (2005). As we recently stated in Zimmerman, "[t]he Fifth Amendment's guarantee `is designed to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole.'" Zimmerman v. Board of Wabaunsee County Commr's, 293 Kan. 332, 345, 264 P.3d 989 (2011) (citing Armstrong v. United States, 364 U.S. 40, 49, 80 S.Ct. 1563, 4 L.Ed.2d 1554 [1960]).
*638 In this case, One-Call is required to comply with extensive government regulation, and there is little debate that the government may regulate private property. See Penn Central Transp. Co. v. New York City, 438 U.S. 104, 124-26, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978) (discussing types of property regulation that the Court held did not constitute a taking). But as we recognized in Zimmerman, the difficulty rests in determining when the government has gone so far in its regulations to effectuate a taking:
"`[G]overnment regulation of private property may, in some instances, be so onerous that its effect is tantamount to a direct appropriation or ouster-and that such "regulatory takings" may be compensable under the Fifth Amendment. In Justice Holmes' storied but cryptic formulation, "while property may be regulated to a certain extent, if regulation goes too far it will be recognized as a taking." 260 U.S. at 415, 43 S.Ct. 158. The rub, of course, has beenand remainshow to discern how far is "too far." In answering that question, we must remain cognizant that "government regulationby definitioninvolves the adjustment of rights for the public good" [citation omitted] and that "Government hardly could go on if to some extent values incident to property could not be diminished without paying for every such change in the general law." [Citations omitted.]'" Zimmerman, 293 Kan. at 345, 264 P.3d 989.
Determining when the government has gone too far is, as the Kansas Supreme Court states, "the rub." There are two types of regulations that the United States Supreme Court considers per se takings. "`First, where government requires an owner to suffer a permanent physical invasion of her propertyhowever minorit must provide just compensation.'" Frick v. City of Salina, 290 Kan. 869, 885, 235 P.3d 1211 (2010) (citing Lingle v. Chevron U.S.A. Inc., 544 U.S. 528, 538, 125 S.Ct. 2074, 161 L.Ed.2d 876 [2005]). The second rule applies to "regulations that completely deprive an owner of `all economically beneficial us[e]' of his or her property." Frick, 290 Kan. at 885, 235 P.3d 1211 (citing Lingle, 544 U.S. at 538, 125 S.Ct. 2074).

Did the Kansas Legislature Take One-Call's Private Property by Establishing the Tier System for Referral Fees?
Kansas statutes require that all utilities in Kansas become a member of the notification center. K.S.A. 2011 Supp. 66-1805(a). And the notification center is required to notify its member utilities of any proposed excavation, assuming the member utility has underground facilities near the excavation site. K.S.A. 2011 Supp. 66-1805(b), (c); K.A.R. 82-14-4. While an excavator is not explicitly required to call the notification center to ascertain the location of underground utilities, no excavation near underground facilities may proceed in Kansas unless the excavator has ascertained the "location of all underground facilities in the proposed area of the excavation." K.S.A. 66-1803; K.A.R. 82-14-2. But see K.S.A. 2011 Supp. 66-1804 (making an exception for emergency excavations). The parties agree that the notification center is the linchpin to the notification program as it handles most of the notification center requests in the State.
As previously discussed, One-Call, a private company, operates the notification center and is required to notify utilities of proposed excavations. So long as One-Call operates the notification center, the government appears to be requiring a private company (One-Call) to engage in the production of services. Traditionally, in utility rate regulation takings cases, there is a statute that requires the utilities to provide efficient and sufficient service to the public. See K.S.A. 66-101b. But in stark contrast to the traditional cases, there is no statute that requires One-Call to run the notification center. There is no taking because no private property is being used for a public purpose. This case, therefore, is analogous to Yee v. Escondido, 503 U.S. 519, 112 S.Ct. 1522, 118 L.Ed.2d 153 (1992).
In Yee, the City of Escondido in 1988 enacted rent control ordinances that set mobile home rents back to their 1986 levels and prohibited rent increases without the approval of the city board. The petitioners, mobile home park owners, sued arguing that the *639 rent control law deprived them of "all use and occupancy of [their] real property" to the extent it constituted a taking. 503 U.S. at 525, 112 S.Ct. 1522. The Supreme Court disagreed. The rent control ordinances regulated the relationship between the landlord and the tenant, but they did not require the petitioners to rent their mobile homes. The petitioners voluntarily rented their land to mobile home owners and were not required to continue to do so. As a result, the rent control ordinances did not authorize an unwanted physical occupation of the petitioners' land and was not a per se taking. Yee, 503 U.S. at 531, 112 S.Ct. 1522; see also Bowles v. Willingham, 321 U.S. 503, 517, 64 S.Ct. 641, 88 L.Ed. 892 (1944) (rent control ordinance not a taking because it did not require that the property owners to rent their property); Garelick v. Sullivan, 987 F.2d 913, 916 (2d Cir.1993) ("By contrast, where a service provider voluntarily participates in a price-regulated program or activity, there is no legal compulsion to provide service and thus there can be no taking."). Likewise, One-Call has voluntarily agreed to participate in a price-regulated program or activity, and there is no legal requirement that it must operate the notification center. Thus, there is no taking.
One-Call's takings claim is also foreclosed by the fact that the fee structure attacked by One-Call does not prohibit the operator of the state's notification center from recovering the costs of providing notification services. The legislation places no cap on fees imposed on Tier 1 utility members while limiting fees on water and wastewater utility operators. As applied to One-Call, this limitation imposes no increased costs on One-Call because it is undisputed that One-Call must raise member fees to cover those increased expenses. Under these circumstances, One-Call has not suffered a taking. The ability to pass along all expenses to members of the notification center ensures that One-Call will always be able to recoup its costs. Even assuming that the new fee structure deprives One-Call of any money in the short-term while it adjusts its fees, One-Call retains the ability to cover its expenses, which means that just compensation is available to it.
Where an entity can pass along costs to others, such as customers or members, just compensation is available for any taking that may have occurred, negating any Fifth Amendment claim. See Kansas City Power & Light Co. v. Kansas Corporation Comm'n, 238 Kan. 842, 715 P.2d 19 (1986). In Kansas City Power & Light Co., the KCC had entered an order implementing a portion of a federal statute concerning the encouragement of entities to cogenerate electricity, and the order required electric utility companies to allow cogenerators of electricity to connect to the utilities' systems, to purchase electricity from cogenerators, and to pay cogenerators the avoided energy cost saved by the utility by not producing the energy received. 238 Kan. at 843, 846, 715 P.2d 19. Kansas City Power & Light Company (KCP & L) challenged the KCC order on several grounds, including that the requirement to pay cogenerators the avoided energy cost was an unconstitutional taking. The court noted that the function of requiring compensation for a taking is "to put the owner in as good a position pecuniarily as he would have occupied if his property has not been taken." 238 Kan. at 848, 715 P.2d 19 (quoting Olson v. United States, 292 U.S. 246, 54 S.Ct. 704, 78 L.Ed. 1236 [1927]). Accordingly, the court rejected the takings claim because KCP & L "is allowed to charge its ratepayers its avoided cost paid to the cogenerators, plus a profit." 238 Kan. at 848, 715 P.2d 19. Because the utility company was made whole through recouping any additional costs, it received just compensation.
One-Call's situation is analogous to KCP & L. Whenever One-Call's expenses exceed revenues, it can increase fees to cover those increased costs. Under the amendments, any increased costs may be passed along to Tier 1 utilities and, in part, to Tier 2 utilities, whose rates are capped at 50% of Tier 1 utilities. Thus, One-Call retains the ability to pass through costs and has not been deprived of any money. For that reason, no taking has occurred as a result of the amendments. Consequently, One-Call's takings argument fails.
Affirmed.
*640 MORITZ, J., not participating.
GREEN, J., assigned.