IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 120,436

In the Matter of the Joint Application of
WESTAR ENERGY, INC.
and
KANSAS GAS AND ELECTRIC COMPANY.

SYLLABUS BY THE COURT

1.

K.S.A. 66-117d and K.S.A. 66-1265(e) do not conflict. K.S.A. 66-117d addresses the raw price utilities may permissibly charge for the sale of energy to customers producing a portion of their own energy while K.S.A. 66-1265(e) addresses the rate structure utilities may use when selling energy to customers who began producing energy after 2014.

2.

Under K.S.A. 66-117d, utilities cannot charge customers producing their own energy more than they charge other customers based on that distinction.

3.

K.S.A. 66-1265(e) allows utilities to use a different rate structure for certain customers producing a portion of their own energy. But for the different rate structure to be valid under Kansas law, the ultimate cost to the customer remains subject to the requirements of K.S.A. 66-117d.

Review of the judgment of the Court of Appeals in an unpublished opinion filed April 12, 2019. Appeal from Kansas Corporation Commission. Opinion filed April 3, 2020. Judgment of the Court of

Appeals affirming the Kansas Corporation Commission is reversed. Judgment of the Kansas Corporation Commission is reversed and the case is remanded with directions.

*David C. Bender*, pro hac vice, of Earthjustice, of Madison, Wisconsin, argued the cause, and *Robert V. Eye*, of Robert V. Eye Law Office, LLC, of Lawrence, and *Sunil Bector*, pro hac vice, of Sierra Club, of Oakland, California, were with him on the briefs for petitioners/appellants Sierra Club and Vote Solar.

*Martin J. Bregman*, of Bregman Law Office, L.L.C., of Lawrence, argued the cause, and *Cathryn J. Dinges*, of Westar Energy, Inc., was with him on the briefs for respondent/appellees Westar, Inc. and Kansas Gas and Electric Company.

*Brian G. Fedotin,* general counsel, argued the cause, and *Michael J. Duenes*, assistant general counsel, was with him on the briefs for respondent/appellee Kansas Corporation Commission.

The opinion of the court was delivered by

STEGALL, J.:  In 2018, claiming declining sales and rising costs, Westar Energy, Inc. and Kansas Gas and Electric Company (Utilities) applied to the Kansas Corporation Commission (Commission) for a rate increase. The application included a proposed net rate increase of $52.6 million a year, as well as changes in the residential rate design. The Commission permitted numerous interested parties to intervene.

Eventually, most of the parties reached a settlement agreement that included the rate design changes still at issue here. As the lower court explained, the Utilities have traditionally "recovered the costs of providing electricity through a two-part rate involving a flat service charge and a variable energy charge based on the number of kilowatt hours (kWh) used in a monthly billing period." *In re Joint Application of Westar Energy and Kansas Gas and Electric Co.*, No. 120,436, 2019 WL 1575480, at *2 (Kan. App. 2019) (unpublished opinion). The Utilities, however, don't recover all their fixed costs through the flat service charge and have opted instead to fold some of those fixed

2

costs into the variable energy charge. "A utility company could apportion its fixed costs among its customers at a flat rate and limit the variable rate to the recovery of actual generation costs, but utilities have traditionally sought to recover fixed costs through the variable rate as an incentive for customers to exercise prudent energy consumption." 2019 WL 1575480, at *2.

This same interplay between designing a sound economic model of electricity generation and delivery, on the one hand, and promoting a policy of responsible energy production and use, on the other, is at the heart of today's dispute. This is because some of the Utilities' customers are less dependent than others on the primarily fossil-fueled electricity sold by the Utilities. These customers are known as "partial requirements customers" or "residential distributed generation customers" (DG customers) because they generate their own electricity from a renewable source such as wind or the sun.

Still connected to the utility grid, so-called DG customers have always paid the flat service charge, just like everyone else. But as a class, they use less utility generated electricity and thus the variable energy portion of their utility bills is lower. In fact, in some cases, if the DG customer is generating more electricity than they use and selling the excess back to the grid, the variable energy portion of the bill may amount to a net-zero.

According to the Utilities, this has created what is sometimes referred to in economic parlance as a "free rider" problem. Malm, *An Actions-Based Estimate of the Free Rider Fraction in Electric Utility DSM Programs*, 17 The Energy Journal No. 3, 41 (1996) (defining free riders as individuals who impose costs on the system without providing benefits such as payment). As one study, procured by the Utilities and made part of the record before the Commission, put it:

"When a customer conserves energy, the utility produces less energy, and thus incurs less energy production cost (e.g. fuel or purchased power). This should amount to a dollar-for-dollar savings for both the customer and the utility. However, when a customer conserves energy, the utility does not incur lower fixed costs, like capital investments in power plants (production demand), or substations and poles (distribution demand), or meters, billing, or customer service representatives (customer). When some customers are able to reduce their energy consumption by installing DG they avoid paying fixed costs that the utility continues to incur to provide the customer with needed services. Ultimately, those costs will be shifted to customers that do not have DG, resulting in a hidden subsidy from non-DG to DG customers."

To remedy this alleged economic imbalance, the Utilities sought and obtained approval of a new rate structure applicable only to DG customers—the residential distributed generation (RS-DG) rate design. And even though most of the intervenors joined the settlement agreement approving the new rate structure, some objected. For reasons that will become apparent, we need not recite the long procedural history before the Commission or summarize the substantial factual record below. It will suffice to note that the Commission ultimately issued its decision to approve the non-unanimous settlement agreement. Two of the objecting intervenors—the Sierra Club and Vote Solar (Renewable Energy Advocates)—appealed the Commission's action to the Court of Appeals.

All along, the Utilities' arguments have been driven by their view that the ongoing viability of their economic model depends on fixing the inequities created by DG customers not paying their "fair share." Of course, the overall rate structure chosen by the Utilities—which puts a portion of fixed costs into the variable energy charge—is itself designed to incentivize reduced energy consumption. As such, one would be justified in wondering whether the free rider problem identified by the Utilities is a feature of the system rather than a bug (because lower energy users will necessarily pay a smaller per-unit share of the fixed costs).

4

In any event, though we are not insensible to the economic arguments, we find that in this particular case we can move past them with relative ease. This is because the policy favoring customers who generate a portion of their own energy from renewable sources was chosen by the policy makers in our Legislature and is cemented in Kansas law. And interpreting and enforcing statutes as they are written is the job of this court, not deciding whether those statutes effect good or bad policy.

ANALYSIS

Distributed generation systems are not new. On the heels of several energy and oil shortages in the 1970s, President Jimmy Carter and his administration confronted America's crisis relationship with fossil fuels. President Carter addressed the nation several times reiterating the need for "strict conservation" and the use of "permanent renewable energy sources like solar power" to protect the environment, achieve economic growth, and gain independence as a country. Carter, *The Energy Problem*, Address to the Nation (April 18, 1977), *in* 1 Public Papers of the Presidents of the United States: Jimmy Carter 656, 657 (1977); see also Tomain, *The Dominant Model of United States Energy Policy*, 61 U. Colo. L. Rev. 355, 369-72 (1990) (highlighting President Carter's energy addresses and legislative developments). President Carter described these efforts as the "'moral equivalent of war.'" Carter, at 656. To show dedication to the cause, he even installed solar panels on the White House. See Outka, *Environmental Law and Fossil Fuels: Barriers to Renewable Energy*, 65 Vand. L. Rev. 1679, 1691 (2012).

At the same time, growing concerns that fossil fuels were contributing to global climate change also began to drive efforts to incentivize conservation and alternative-source energy generation. "In general, the process of balancing energy and environmental objectives has been a common theme underlying many of the major actions of Congress, the courts, the executive branch, and the independent agencies during the past year."

5

*Report of Committee on the Environment*, 1 Energy L.J. 119 (1980). Many worried that "the continued burning of fossil fuels will increase the level of carbon dioxide in the air. Some scientists believe that this increase could create a so-called 'greenhouse effect', increasing the temperatures at the earth's surface and causing dramatic changes in the climate." 1 Energy L.J. at 121.

For example, in 1981 the International Council of Scientific Unions (ICSU) issued a statement warning that "growth in fossil fuel consumption, particularly by drawing upon the earth's very large coal resources" could create "increases in carbon dioxide concentrations and climate changes in the future" resulting in "temperature rise at the earth's surface." The ICSU noted that the "more vigorous the growth in energy and fossil fuel use, the more accelerated this process would be." Joint WMO/ICSU/UNEP Meeting of Experts: On the Assessment of the role of $CO_2$ on Climate Variations and their Impact 1-2 (January 1981). David Rose—a nuclear engineer and professor at the Massachusetts Institute of Technology who became an early advocate of fossil fuel alternatives—wrote during this time that "coal and other fossil fuels will in about fifty years bring about the conditions for unavoidable temperature and climate changes." Rose, *Energy Prospects for the Long Term*, 125 Proceedings of the American Philosophical Society 269, 271 (1981).

Professor Rose and others in this period of history began to suggest that based on their "current understanding of the effect of $CO_2$ on climate and trends in global energy use, a significant $CO_2$ warming in the next century probably cannot be avoided." But the "rate of increases of atmosphere $CO_2$ due to fossil fuel consumption can be significantly reduced" if governments and other actors incentivized the adoption of "energy strategies that are relatively '$CO_2$-benign.'" Rose et al., *Global Energy Futures and $CO_2$-Induced Climate Change: Report Prepared for Division of Policy Research and Analysis, National Science Foundation* 6-7, 11-12 (Energy Laboratory, Massachusetts Institute of Technology 1983).

As promised, President Carter signed a package of legislation into law designed to combat the nationwide energy crisis, including the Public Utilities Regulatory Policies Act of 1978, Pub. L. 95-617, 92 Stat. 3117 (PURPA). *FERC v. Mississippi*, 456 U.S. 742, 745, 102 S. Ct. 2126, 72 L. Ed. 2d 532 (1982). As described by this court, "PURPA was designed to encourage increased conservation of electric energy, increased efficiency in the use of facilities and resources by electric utilities, and equitable retail rates for electric consumers." *Kansas City Power & Light Co. v. Kansas Corporation Comm'n*, 238 Kan. 842, 854-55, 715 P.2d 19 (1986). PURPA directed the Federal Regulatory Energy Commission (FERC) to consult with state regulatory agencies and promulgate rules "'to encourage cogeneration and small power production.'" *FERC*, 456 U.S. at 751 (quoting 16 U.S.C. §824a-3[a]). This included an instruction to create a rule that prohibited utilities from "discriminat[ing] against qualifying cogenerators or qualifying small power producers." 16 U.S.C. §824a-3(c)(2) (2018). This category of small power producers included residential customers producing solar power. See 16 U.S.C. § 796 (17)(A) (2018) (defining a small power production facility as a facility that produces fewer than 80 megawatts of renewable energy); see also 18 C.F.R. §§ 292.101(b)(1); 292.203(a), (d); 292.204 (2019) (defining a qualifying small power production facility as a facility that produces fewer than 80 megawatts of energy and exempting facilities with a net power production capacity of 1 MW or less from filing requirements).

As a result, FERC adopted regulations relating to purchases and sales of electricity to and from cogeneration and small power facilities in 1980. The regulations included an antidiscrimination provision providing that "rates for sales . . . [s]hall not discriminate against any qualifying facility in comparison to rates for sales to other customers served by the electric utility." 18 C.F.R. § 292.305(a)(1)(ii) (2019).

This history is significant not because it is (or is not) dispositive of the underlying claims about fossil fuels and their relative benefit or harm to society, but because it

7

describes the political, economic, and cultural context within which Kansas law developed. States such as Kansas responded in this historical moment by developing their own conservation programs. See Scott, *Teaching An Old Dog New Tricks: Adapting Public Utility Commissions To Meet Twenty-first Century Climate Challenges*, 38 Harv. Envtl. L. Rev. 371, 388 (2014) ("In the 1980s, a number of states began following the federal example and developing their own conservation programs."); see also *Kansas City Power & Light Co. v. Kansas Corporation. Comm'n*, 234 Kan. 1052, 1054, 676 P.2d 764 (1984) (stating that the Kansas Legislature "recognize[ed] the need for energy conservation and cogeneration" in 1979 after PURPA's enactment). Thus, in 1980, the Kansas Legislature enacted K.S.A. 66-117d, L. 1980, ch. 201, § 1:

> "No electric or gas utility providing electrical or gas service in this state shall consider the use of any renewable energy source other than nuclear by a customer as a basis for establishing higher rates or charges for any service or commodity sold to such customer nor shall any such utility subject any customer utilizing any renewable energy source other than nuclear to any other prejudice or disadvantage on account of the use of any such renewable energy source."

Contrary to the Utilities' current economic arguments, at least at the time K.S.A. 66-117d was enacted, there was a widely held belief that incentivizing consumer generation of electricity was economically beneficial to the entire electric generation system. The basic idea was that "[p]roperly designed and integrated solar devices" would "reduce consumers' need for electricity during peak demand periods" which would in turn allow "utilities to achieve load management control." Lawrence & Minan, *Financing Solar Energy Development Through Public Utilities*, 50 Geo. Wash. L. Rev. 371, 378 (1982). The energy crises of the 1970s led to rocketing fixed costs and "adversely affected the economics of public utility operations." To deal with this problem, "many electric companies changed their marketing objectives from promoting greater power consumption to encouraging greater diversification of consumer demand." By "spreading customer demand more evenly over a given time period" utilities hoped to "use existing

8

plant capacity more efficiently" and avoid the economic losses associated with the "increase[d] generating capacity" sitting idle "during off-peak hours." This kind of load management was believed to be achievable at least in part through customer owned solar power-plants. "These economic considerations explain electric utilities' self-interest in integrating solar energy applications with their services." 50 Geo. Wash L. Rev. at 377, 379.

The Utilities in this case appear to have given up on the economic promise once attached to the private generation of electricity from renewable resources. Indeed, the Utilities admitted at oral argument that under their proposed RS-DG rate design, DG customers will pay more for their electricity than other customers and that, considered in isolation, this violates K.S.A. 66-117d. But the Utilities argue K.S.A. 66-117d is invalid and cannot be applied to the RS-DG rate design because it conflicts with a more recent statute—K.S.A. 66-1265(e). And, being the more recent statute, the Utilities argue that K.S.A. 66-1265(e) preempts K.S.A. 66-117d and allows the Utilities to charge more to DG customers than they do to non-DG customers—all for providing the same services and selling the same energy.

Under K.S.A. 66-1265(e):

> "Each utility shall:
>
> . . . .
>
> "(e) for any customer-generator which began operating its renewable energy resource under an interconnect agreement with the utility on or after July 1, 2014, have the option to propose, within an appropriate rate proceeding, the application of time-of-use rates, minimum bills or other rate structures that would apply to all such customer-generators prospectively."

9

The Court of Appeals agreed with the Utilities, finding that the two statutes conflicted because K.S.A. 66-1265(e) authorized utilities to charge DG customers higher rates. *Westar Energy*, 2019 WL 1575480, at *6. Thus, the panel concluded that K.S.A. 66-1265(e) must control because it is the latest pronouncement from the Legislature and the more specific statute. 2019 WL 1575480, at *6 (quoting *State v. Englund*, 50 Kan. App. 2d 123, Syl. ¶ 3, 329 P.3d 502 (2014) ("'When there is a conflict between two statutes the latest legislative expression generally controls. But when the conflict is between a general principle of law and a more specific enactment, the more specific statute controls.'").

We must now determine whether the RS-DG rate design violates Kansas law. K.S.A. 66-118a(b) gives jurisdiction over Commission actions to the Kansas Court of Appeals, and we have unlimited jurisdiction to review decisions of that intermediate court. K.S.A. 66-118a(b) ("The court of appeals shall have exclusive jurisdiction to review any agency action of the state corporation commission arising from a rate hearing . . . ."); K.S.A. 60-2101 ("The supreme court shall have jurisdiction to correct, modify, vacate or reverse any act, order or judgment of a district court or court of appeals . . . ."); see also *GFTLenexa, LLC v. City of Lenexa*, 310 Kan. 976, 981, 453 P.3d 304 (2019) ("This court exercises concurrent jurisdiction with the Court of Appeals over all appeals over which the Court of Appeals has jurisdiction . . . ."). The Kansas Judicial Review Act (KJRA), K.S.A. 77-601 et seq., governs our review of this issue. K.S.A. 66-118c. Under the KJRA, an appellate court may grant relief when the Commission has erroneously interpreted or applied the law. K.S.A. 77-621(c)(4). Our review of the Commission's actions requires us to interpret both K.S.A. 66-117d and K.S.A. 66-1265(e). Interpretation of a statute is a question of law over which we exercise plenary review. *Midwest Crane & Rigging, LLC v. Kansas Corporation Comm'n*, 306 Kan. 845, 848, 397 P.3d 1205 (2017).

In short, we disagree with the lower court's holding that the statutes conflict. When interpreting and comparing K.S.A. 66-117d and K.S.A. 66-1265(e), we abide by the most

10

fundamental rule of statutory interpretation—that the intent of the Legislature governs if that intent can be ascertained. *Harsay v. University of Kansas*, 308 Kan. 1371, 1381, 430 P.3d 30 (2018). In ascertaining this intent, we begin with the plain language of the statute, giving common words their ordinary meaning. *Nauheim v. City of Topeka*, 309 Kan. 145, 149, 432 P.3d 647 (2019). We will only review legislative history or use canons of construction if the statute's language or text is unclear or ambiguous. 309 Kan. at 150.

Under this plain language analysis, we can discern no conflict between the statutes. On the one hand, K.S.A. 66-117d is an antidiscrimination provision that prohibits utilities from charging DG customers a higher price than non-DG customers for the same service. K.S.A. 66-117d focuses on the price of the goods and services sold by the Utilities. On the other hand, K.S.A. 66-1265(e) addresses rate structure rather than price. K.S.A. 66-1265(e) allows utilities to propose separate rate structures that would apply to all DG customers that began generating their own electricity after 2014. The Utilities argue that K.S.A. 66-1265(e)'s language permits utilities to charge DG customers a higher price than they charge to non-DG customers, reasoning that a change in rate structure necessarily impacts price. And this means the two statutes conflict, evincing a legislative desire to repeal K.S.A. 66-117d.

But while it is clearly true that a change in rate structure could impact the ultimate price charged by Utilities for providing their goods and services, we can imagine a rate structure change that would not result in price discrimination against DG customers. The two statutes can coexist. To adopt the position advocated by the Utilities, however, would require us to read something into K.S.A. 66-1265(e) not found in its text—something we routinely refuse to do. See, e.g., *State v. Ayers*, 309 Kan. 162, 164, 432 P.3d 663 (2019) ("'[W]hen a statute is plain and unambiguous, the appellate courts will not speculate as to the legislative intent behind it and will not read such a statute so as to add something not readily found in the statute.'").

By glossing over this price versus structure distinction, both the Utilities and the Court of Appeals effectively write K.S.A. 66-117d out of the books. This runs contrary to a bedrock principle of statutory interpretation that "'[r]epeal by implication is not favored.'" *In re City of Wichita*, 274 Kan. 915, 929, 59 P.3d 336 (2002) (quoting *State v. Roderick*, 259 Kan. 107, 111, 911 P.2d 159 [1996]). We have long resisted repealing statutes without either express language to that effect or "a later enactment [that] is so repugnant to the provisions of the first act that both cannot be given force and effect." *In re City of Wichita*, 274 Kan. at 929; see also *State v. Holcomb*, 93 Kan. 424, 425, 144 P. 266 (1914) ("where the legislature intends to repeal a statute it is done in express terms, and so it is said that 'the presumption is always against the intention to repeal where express terms are not used'"). Instead, "[s]tatutes should be read as consistent with one another" so that both statutes can be given effect. *Stanley v. Sullivan*, 300 Kan. 1015, 1021, 336 P.3d 870 (2014).

By its plain text, K.S.A. 66-117d clearly prohibits the Utilities from price discrimination against DG customers, something the Utilities admit they are trying to do. By its plain text, K.S.A. 66-1265(e) authorizes the Utilities to apply alternative rate structures to DG customers. Examples of such rate structures given in the statute are "time-of-use rates" or "minimum bills." But there is nothing in K.S.A. 66-1265(e) suggesting that such a rate structure does not also have to comply with the price nondiscrimination provisions of K.S.A. 66-117d. In other words, while utilities may try to alter the rate structure applicable to DG customers, they must do so within the larger context of a nondiscriminatory price regime. We find the Utilities' arguments that this reading would prohibit utilities from recovering the cost of serving DG customers unpersuasive.

Here, the proposed rate does not reflect an added service justifying a higher cost. The Utilities want to impose a mandatory three-part rate design for DG customers as

12

opposed to the two-part rate design applied to non-DG customers. Both rate designs include a basic service fee and a kilowatt hour energy charge. The three-part rate design, however, adds an additional "demand charge" for DG customers. This demand charge includes a flat fee of $3 in the winter and $9 in the summer. There is no question that the RS-DG rate at issue here is not built on a time-of-use rate or a minimum bill. It is simply price discrimination. And this price discrimination undermines the policy preferences of our Legislature—as expressed in K.S.A. 66-117d—which has codified the goal of incentivizing renewable energy production by private parties as we have already described.

We can think of several ways the Utilities could attempt to reduce or eliminate their economic "free rider" problem without creating a regime of price discrimination. For example, the Utilities could simply restructure their rates so that their fixed costs are fully recovered by the flat fee charged to each customer hooked to the grid. Alternatively, the Utilities could impose a nondiscriminatory time-of-use rate, or a sliding scale rate that decreased the per-unit price as the customer purchased a higher volume of energy—thus rewarding high volume purchasers. Of course it is beyond the scope of this opinion to predict whether these alternative price schemes would clear either the political or legal hurdles they might face. These examples simply illustrate that price discrimination is not the only way to achieve an equitable market for the sale of electricity within statutory parameters. Our decision today does not impose any restrictions on the Utilities' and Commission's economic judgments concerning how best to structure the generation and sale of electricity other than the restriction imposed by the Kansas Legislature in K.S.A. 66-117d.

The proposed RS-DG rate design violates K.S.A. 66-117d because it uses a customer's DG status as a basis for charging more for the same goods and services than the Utilities charge to non-DG customers. And the requirements of K.S.A. 66-117d

13

remain valid and enforceable against the Utilities. Therefore, the RS-DG rate design is unlawful and the Commission erred by approving a discriminatory rate in violation of K.S.A. 66-117d.

The judgment of the Court of Appeals is reversed. The judgment of the Kansas Corporation Commission is reversed, and this matter is remanded to the Commission for further proceedings consistent with this opinion.

BEIER, J., not participating.

HENRY W. GREEN, JR., J., assigned.[1]

STEVE LEBEN, J., assigned.[2]

NEIL B. FOTH, District Judge, assigned.[3]

---

[1]**REPORTER'S NOTE:**  Judge Green, of the Kansas Court of Appeals, was appointed to hear case No. 120,436 under the authority vested in the Supreme Court by K.S.A. 2019 Supp. 20-3002(c) to fill the vacancy on the court by the retirement of Justice Lee A. Johnson.

[2]**REPORTER'S NOTE:**  Judge Leben, of the Kansas Court of Appeals, was appointed to hear case No. 120,436 under the authority vested in the Supreme Court by K.S.A. 2019 Supp. 20-3002(c) to fill the vacancy on the court by the retirement of Chief Justice Lawton R. Nuss.

[3]**REPORTER'S NOTE:**  District Judge Foth was appointed to hear case No. 120,436 vice Justice Beier under the authority vested in the Supreme Court by art. 3, § 6(f) of the Kansas Constitution.